NESTOR COLON MEDINA &
SUCESORES, INC., et al.,
Plaintiffs, Appellants,

v.

Patria G. CUSTODIO, et al.,
Defendants, Appellees.

No. 91–1469.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1991.

Decided May 7, 1992.

Jose R. Garcia Perez with whom Raul E. Gonzalez Diaz and Gonzalez, Bennazar & Colorado were on brief, for plaintiffs, appellants.

Zuleika Llovet with whom Marcos A. Ramirez Lavandero, Ramirez & Ramirez, Hector Rivera Cruz, Secretary of Justice, and Jorge E. Perez Diaz, Sol. Gen., were on brief for defendants, appellees.

Before CAMPBELL and TORRUELLA, Circuit Judges, and SKINNER,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Appellants brought suit in the District Court for the District of Puerto Rico under 42 U.S.C. § 1983, alleging that appellees' refusal to grant them certain land use permits violated provisions of the United States Constitution. The district court allowed appellees' motion for summary judgment on all claims. 758 F.Supp. 784. We affirm, except we vacate and remand for further proceedings as to appellants' First Amendment claim regarding denial of a residential site permit.

## I.

Appellants are Nestor Colón–Medina & Sucesores, Inc. ("Sucesores") and Dr. Máximo Cerame Vivas, his wife Maria J. Colón and their conjugal partnership. Cerame Vivas is the president of the board of directors of Sucesores. He is allegedly an outspoken member of Puerto Rico's pro-statehood New Progressive Party ("NPP") and a prominent critic of the environmental policies of the Popular Democratic Party ("PDP"), which has been in power in Puerto Rico since 1985.[1]

Appellees are Patria Custodio, Lina Dueño and Santos Negrón, the Chairman, Vice Chairman and associate member, respectively, of the Puerto Rico Planning Board ("PRPB"). The PRPB is an agency of the Commonwealth of Puerto Rico, "attached to the Governor's Office." P.R.Laws Ann. tit. 23, § 62a. Defendants were appointed to their positions by the Governor of Puerto Rico, the Honorable Rafael Hernández Colón, a member of the PDP. The PRPB denied appellants' request for three permits: one to construct a hazardous waste disposal facility in Ponce, Puerto Rico, another to construct a domestic waste disposal facility on the same parcel of land, and a third to construct a condominium development in Boquerón, Puerto Rico. The facts surrounding those denials, in the light most favorable to the appellants, are as follows.

### A. The Waste Disposal Permits

On December 10, 1985, Sucesores filed a petition with the PRPB for permits to construct two waste disposal facilities on land outside of Ponce owned by Sucesores. One facility was to handle hazardous and toxic waste; the other was to handle domestic waste. On January 26, 1986, without notice or a hearing, the PRPB denied the petition on a number of grounds related solely to the hazardous waste facility. The PRPB asserted that the proposed hazardous waste facility did not comply with Puerto Rico's "Public Policy and Criteria for the Siting of Hazardous and Toxic Waste Disposal Facilities" (the "Criteria"). Developed pursuant to executive order, the Criteria establish a rating system for evaluating hazardous waste facilities. Among other objections, the PRPB found that there was a risk of contamination of the Pastillo River through runoff and underground seepage of waste, that there was a risk of damage to communities along the narrow and "tortuous" road providing access to the facility, and that the area was

---

* Of the District of Massachusetts, sitting by designation.

1. For convenience, at some points in this opinion, we refer to appellants as "Cerame Vivas."

"unstable" because it lay on two geological faults.

Sucesores asked for reconsideration, and the PRPB, in a resolution signed by defendant Custodio, reopened the application on March 6, 1986. The PRPB asked several federal and state agencies to comment on whether the hazardous waste facility complied with the Criteria. The agencies which responded to the request were the United States Environmental Protection Agency, Fish and Wildlife Service, and Soil Conservation Service, and the Puerto Rico Environmental Quality Board, Solid Waste Management Authority, and Department of Natural Resources. The agency recommendations were generally positive and were reviewed by all three defendants. On September 2, 1986, PRPB Director of Physical Planning Carlos López notified Sucesores that the project fulfilled the "need and convenience" and "exclusive placement" provisions contained in the Criteria. López also asked for additional information concerning the "related placement" provisions of the Criteria, which Sucesores submitted by the end of September.

In the meantime, certain government officials from the Ponce region began to express their opposition to the hazardous waste facility. The opposing officials named by plaintiffs all belonged to the PDP (whether others not so affiliated were opposed was not indicated). Ponce's PDP Senator Ana Nisi Goyco and PDP Representative Samuel Ramírez organized and led a parade through Ponce opposing the project. In September and November, Puerto Rico's Senate Committee on Health and Environment, chaired by Senator Goyco, held public hearings on the projects. The committee heard testimony from a number of scientists and "technical advisors" as well as Cerame Vivas, and, by December 29, 1986, Goyco had publicly announced the committee's opposition to the project. On April 21, 1987, Governor Hernández Colón, himself a native of Ponce, publicly announced his opposition to the project. On April 27, Senator Goyco's committee released a report formally recommending that the project be rejected "for being a hazard to the health and the life of Ponce residents." In August, the Governor was reported to have told members of the Ponce Committee for the Quality of Life that he had given the project an "executive veto," and that "Cerame Vivas could submit all [sic] documents he wants, but the dumping yard does not go forward."

Meanwhile, the PRPB permitting process continued. In December 1986 the PRPB, acting through Chairman Custodio, admitted a group of Ponce residents as intervenors. On January 15, 1987 the PRPB, in a private meeting with other government agencies, graded the project according to the Criteria. Under this rating system, if a project scores higher than 200 points, it is rejected. Sucesores' project scored 178.2 points, which qualified it for further consideration.

On February 10, 1987, a PRPB engineer informed Cerame Vivas that the PRPB would notify Sucesores of a meeting to discuss the Preliminary Environmental Impact Statement ("PEIS"). However, Sucesores was never notified.

On June 23, 1987, the PRPB issued a resolution, signed by defendant Custodio, noting that the project complied with the Criteria but directing Sucesores to submit a PEIS. Sucesores then requested an extraordinary meeting, pursuant to regulation, to determine the content of the PEIS. This request was denied on July 8, 1987, and Sucesores then filed a motion for reconsideration of the PEIS content requirements on the ground that the requested design and construction information should be reviewed at a later stage in the project. After the PRPB denied this motion, Sucesores filed a petition for judicial review in the Puerto Rico Superior Court. The court ordered the PRPB to conduct a hearing on the PEIS requirements. The PRPB did so on February 8, 1988, four months after the court's order. On September 9, 1988, the PRPB modified the content requirements of the PEIS, and Sucesores, while still contesting the revised content requirements, submitted the required document.

On June 29, 1989, the PDP mayor of Ponce wrote to Custodio expressing the

municipality's opposition to the project. Finally, on August 16, 1989 the PRPB denied Sucesores' motion for reconsideration of the original denial of its petition. With respect to the hazardous waste facility, the PRPB cited fundamentally the same reasons it had given for the original denial. The PRPB found that the PEIS did not "clear up or discuss the questions on the possible environmental impact," that "there are grounds to believe that the project does constitute a risk for the environment and that it could have harmful consequences on the health and welfare of the residents of Ponce." The PRPB offered no findings of fact or conclusions of law to support its denial of the domestic waste permit. The entire process took four years.

### B. *The Residential Complex*

While Sucesores' application for the waste disposal permits was pending, Cerame Vivas filed an application for another permit, this one a site permit to construct a "tourist residential complex" in Boquerón, a community approximately 30 miles to the west of Ponce. The complex was to consist of eight condominium units in three buildings. Cerame Vivas filed the site permit application on September 28, 1988, and it was denied about a week later, without notice or a hearing. The PRPB stated that it had denied the permit because of "an excessively high [population] density" and because the project "did not adjust to the conventional yard parameters [i.e., setback regulations] and a variation therefrom was not justified."

Cerame Vivas then moved for reconsideration and proposed altering the project to conform to the setback regulations, but stuck to the original population density. The PRPB affirmed its denial of the permit on December 7, 1988, without making any findings of fact or conclusions of law.

Cerame Vivas sought and obtained judicial review in the Puerto Rico Superior Court, which ordered the PRPB to make findings of fact and conclusions of law. The PRPB issued a resolution on March 13, 1989 reaffirming its denial of the permits on the ground that the sewer facilities in the area were not sufficient to accommodate the project. The question of sewer facilities had not arisen during the earlier administrative proceedings. The Superior Court denied Cerame Vivas's petition for judicial review and for reconsideration. The Puerto Rico Supreme Court also denied a petition for review of the Superior Court's action and two requests for reconsideration.

According to Cerame Vivas, permits for similar projects in the area were routinely granted.

### C. *The § 1983 Claim*

Having been unsuccessful before the PRPB and the Puerto Rico courts, Sucesores, Cerame Vivas, his wife and their conjugal partnership brought this complaint under 42 U.S.C. § 1983 in the United States District Court for the District of Puerto Rico. Plaintiffs alleged that in denying both the hazardous waste and domestic waste disposal permits, defendants had violated the federal Constitution in four respects. First, denial of the permits amounted to "discrimination based on political affiliation" and was in "retaliation [for Cerame Vivas's views] on political matters ... such as ... criticism of the government's action in relation to the environment," all in violation of the First Amendment. Second, plaintiffs alleged that "undue delays, denial of hearings, unfair hearings ... [etc.] deprived Sucesores of its property without procedural due process of law." Third, plaintiffs alleged that Sucesores had suffered damages because of "the infringement of its right to ... substantive due process of law...." Finally, the complaint contained the claim that "[d]efendants' deliberate processing and treatment of the waste disposal petition in a manner that differs invidiously from the process and treatment accorded to others similarly situated deprived Sucesores of its right to equal protection of the law."

In regard to the requested residential site permit for a tourist complex in Boquerón, the complaint alleged that defendants' denial violated the Constitution in the same four respects asserted as to denial of the

waste disposal permits. Declaratory and injunctive relief as well as damages were sought for all alleged violations.

Defendants answered and filed two motions to dismiss, the first based on the Eleventh Amendment and the second based on res judicata and a number of other grounds related to the merits. While these motions were pending, defendants filed a motion to stay discovery. The motion was referred to a magistrate judge, who granted the stay, and plaintiffs appealed to the district judge. At the time the stay was granted, defendants had answered one of the plaintiffs' interrogatories but had not answered two other interrogatories. No depositions had been taken. The district judge never acted on the appeal from the magistrate's grant of this motion, but later, in denying plaintiffs' Rule 59(e) motion, indicated that he saw no need for further discovery.

At the same time they filed their motion for a stay of discovery, defendants filed a motion for summary judgment asserting qualified immunity, as government officials, from suit. This motion was also referred to a magistrate. The magistrate recommended that the district judge grant summary judgment as requested. The district judge did so, but on a different ground. The judge held that, "taking plaintiffs' factual allegation in the complaint as true, the plaintiffs have failed to make out a federal claim under 42 U.S.C. § 1983." The judge also stated that he had conducted "an extensive review of the record" developed in the course of proceedings before the magistrate.

Plaintiffs filed a motion under Rule 59(e) to alter or amend the judgment. The motion alleged that any failure by plaintiffs to "present sufficient evidence to go beyond the allegations of the complaint ... was because discovery in this case was stayed in its earliest stages." In addition, the motion noted several of the exhibits presented in opposition to defendants' motion for summary judgment on qualified immunity grounds and argued that there were "reasonable grounds for a jury to find that the denial of plaintiffs' projects was based on political and personal reasons."

The court denied plaintiffs' Rule 59(e) motion. The court held that "discovery was stayed because the court assumed the factual backgroung [sic] pled in the complaint." Noting that it had "assumed that the denial of the permits was made in bad faith and for improper reasons," the court held that "[u]nder 42 U.S.C. § 1983 and the circumstances of this case, that is not enough to raise a federal claim." The court also noted that "[d]iscovery is not a fishing expedition, and that "parties must disclose some relevant factual background basis for their claim before requested discovery will be allowed." Plaintiffs appeal, arguing that the stay of discovery was error, that they have stated claims under § 1983, and that summary judgment was improper because there was a genuine issue of material fact.

## II.

We turn at the outset to two procedural issues. First, defendants' motion was labeled and presented to the magistrate as one for summary judgment, and the district judge stated that he was granting "defendant's [sic] motion for summary judgment." However, certain statements in the court's opinion suggest that it may have based its rulings on the allegations of the complaint, thus possibly without considering any of the evidentiary materials presented in opposition to the motion for summary judgment. The court stated that "taking plaintiffs' factual allegations in the complaint as true, the plaintiffs have failed to make out a federal claim under 42 U.S.C. § 1983," and that "[e]ven accepting plaintiffs' conclusory allegations and rhetoric as true ... plaintiffs have not made out a federal claim."

Despite those statements, our examination of the record and of the district court's opinion indicate that the district court did, in fact, pay attention to the record, as well as to the allegations in the complaint, in ruling on the summary judgment motion. The judge indeed stated that he had conducted an "extensive review of the record."

The judge appears to have concluded that, taking as true both the allegations of fact contained in the complaint and whatever facts favorable to Cerame Vivas were in the record, plaintiffs had not made out a claim for relief. The judge's reference to plaintiffs' failure to state a claim is confusing, as that is the standard normally associated with a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Nevertheless, the court's position, phrased in terms of the summary judgment standard of Rule 56, appears to have been that, even if all the facts both as alleged and set out in the summary judgment record (taken most favorably to plaintiffs) were true, defendants were entitled to judgment as a matter of law.

A second, and related, issue is whether the district court correctly denied plaintiffs' request for further discovery. In his Rule 59(e) motion, Cerame Vivas asked the district court to reconsider its grant of summary judgment, in part because he had not been given an adequate opportunity to conduct discovery. The district court denied this motion, noting that "parties must disclose some relevant factual background basis for their claim before the requested discovery will be allowed." The court further stated that there was no need for discovery because it had "assumed the factual backgroung [sic] pled in the complaint."

■ In considering whether the district court correctly rejected the request for additional discovery, we look, in part, to the law developed under Federal Rule of Civil Procedure 56(f).[2] Ordinarily, a party who wishes to conduct further discovery before the court acts on a summary judgment motion should present timely affidavits under Rule 56(f). Cerame Vivas was unaware, however, when the motion was filed that it would be decided on grounds other than the asserted one of qualified immunity. He tendered materials contesting it on that basis, and the magistrate recom-

mended allowing it on that ground alone. When the district judge allowed summary judgment on the merits of the underlying claims, Cerame Vivas promptly filed a Rule 59(e) motion, arguing that further discovery was necessary. In these circumstances, we review the denial of the Rule 59(e) motion with reference to the standards of Rule 56(f). *See generally Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 988 (1st Cir.1988) (in some cases a nonaffidavit pleading may satisfy Rule 56(f)).

■ To satisfy Rule 56(f), a party must "articulate a plausible basis for the belief that discoverable materials exist which would raise a trialworthy issue." *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991). The district court's denial of a Rule 56(f) motion is reviewable only for abuse of discretion. *Id.* Applying these standards, we sustain in all but one respect the district court's denial of Cerame Vivas's discovery request.

Cerame Vivas stated in his Rule 59(e) motion that

discovery could have yielded [1] evidence that defendants did not really give due consideration to plaintiffs' projects, [2] explicit admissions that defendants were at least aware of their political and governmental bosses' opposition to the projects, and [3] the similarity between plaintiffs' tourist residential project and other projects which were granted permits to be built in the same neighborhood.

With regard to the waste disposal permits, we do not see how obtaining the above information would have raised a "trialworthy issue." We may assume that further discovery would have yielded evidence bolstering plaintiffs' assertion that defendants did not give adequate consideration to the waste disposal permits. We may further assume that discovery would have lent support to the charge that defendants considered the opposition of their political su-

---

**2.** Rule 56(f) provides that "[s]hould it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may ... order ... discovery to be had...." Fed.R.Civ.P. 56(f).

periors in rejecting the application. But evidence of this would still not establish that defendants' actions violated the Constitution. Cerame Vivas's First Amendment case relative to denial of the waste disposal permits fails for lack of evidence that whatever shortcomings and irregularities occurred were in retaliation for Cerame Vivas's personal political views. Cerame Vivas's equal protection and due process claims likewise fail for reasons the above evidence would not have remedied, *infra.*

■ Moreover, even assuming this evidence would have raised a "trialworthy issue," plaintiffs forfeited the right to discovery relative to the waste disposal permits by their inability to state a material claim in the complaint and supplementary record. We have held that, in order to survive a motion to dismiss, a civil rights plaintiff must point, with at least some minimal specificity, to the rudimentary facts supporting his claim. Mere conclusory allegations, standing alone, are not enough; and it is only after stating a valid claim that a plaintiff can insist upon a right to discovery. *See Goldman v. Sears, Roebuck & Co.,* 607 F.2d 1014, 1019 (1st Cir. 1979); *Fisher v. Flynn,* 598 F.2d 663, 665 (1st Cir.1979). If this were not so, a party entirely lacking in a cause of action could sue first and then "fish" to see if he could discover a cause of action. That principle applies here. As noted *infra,* there is a total absence of facts, either alleged in the complaint or appearing in the record as so far developed, in support of the proposition that the waste disposal permits were denied in retaliation for plaintiffs' political views, or for some other constitutionally impermissible reason, rather than for such commonplace reasons as local opposition to the project itself. As Cerame Vivas was unable to provide minimal supporting factual allegations, and as nothing he later presented supplemented that deficiency, the district court did not abuse its discretion in denying further discovery relative to the waste disposal permits.

■ The situation is different with regard to defendants' denial of the residential site permit. Here, plaintiffs set forth enough, *infra,* to indicate that they *may* conceivably be able to make out a triable issue that that permit was denied because of hostility to Cerame Vivas's partisan political views and affiliation. Critical to this issue is a showing that the residential project for which the site permit was sought was essentially similar to other projects for which permits had been routinely granted. *See infra.* Because plaintiffs' factual allegations and materials sufficed, at this preliminary stage, to present this critical issue, the district court should have allowed discovery before ruling on the summary judgment motion.

■ We move now to the question whether the district court correctly granted summary judgment for the defendants on the record before it. This court reviews de novo the district court's grant of summary judgment. *See Rodrigues v. Furtado,* 950 F.2d 805, 808 (1st Cir.1991); *Siegal v. American Honda Motor Co.,* 921 F.2d 15, 17 (1st Cir.1990). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(d). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether to grant summary judgment, a court must "review the record, together with all reasonable inferences therefrom, in the light most favorable to the non-moving party." *Furtado,* 950 F.2d at 809.[3]

**3.** Plaintiffs never raised their constitutional claims in the Puerto Rico courts. Therefore, although neither party raised the issue, we asked the parties to brief the question whether plaintiffs' claims are barred by the doctrine of claim preclusion. We conclude that they are not, because it is not clear that Puerto Rico law would have allowed such claims to be raised in the earlier judicial proceedings. Instead, it appears that those proceedings were limited to an administrative review on the record. See Uniform Administrative Procedures Act for the Commonwealth of Puerto Rico, Act No. 170,

### A. *Procedural Due Process*

██ Appellants claim that they were deprived of their property right to the permits without due process of law because the PRPB took several years to act finally on the permits, did not give a sufficient hearing to appellants, considered ex parte evidence and did not make sufficient findings of fact or conclusions of law. These deficiencies allegedly violated the requirements of Puerto Rico and federal constitutional law set forth in *Lopez v. PRPB*, 80 P.R.R. 625 (1958).

In *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28 (1st Cir.1991), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 1151, 117 L.Ed.2d 400 (1992), we rejected a procedural due process claim on facts very similar to those at issue here. In *PFZ Properties*, the PRPB approved PFZ's preliminary development plan for a hotel complex, but the Puerto Rican Regulations and Permits Authority (ARPE), after granting some of the required building permits, refused for several years to process additional permit applications. Finally, the ARPE informed PFZ that the earlier permits granted by PRPB and ARPE had been revoked. PFZ's petitions for reconsideration by the ARPE and review in the Puerto Rico Superior and Supreme Courts were all denied. This court affirmed the dismissal of PFZ's procedural due process claim on the grounds that, even assuming PFZ had a property interest in the permits, an issue we declined to resolve, the denial and revocation of the permits did not violate procedural due process. First, we concluded that no additional pre-deprivation process had been required as the asserted deprivation of property resulted, allegedly, from "conduct of state officials violative of state law." *Id.* at 31 (citing *Parratt v. Taylor*, 451 U.S. 527, 543, 101 S.Ct. 1908, 1917, 68 L.Ed.2d 420 (1980)). Second, we held that adequate post-deprivation process was available because PFZ had the right to petition for reconsideration in the ARPE and the right to judicial review in the Puerto Rico courts, even though PFZ's requests were rejected. *Id.*

August 12, 1988 (English version not yet codi-

We see no meaningful distinction between this case and *PFZ Properties* in respect to procedural due process. Appellants do not challenge the facial adequacy of the PRPB permitting procedures themselves; rather, they claim that PRPB officials, acting under the malign influence of the governor and other politicians, violated and abused those procedures. In such circumstances, Puerto Rico cannot be faulted for failing to have provided other pre-deprivation process. *See Parratt*, 451 U.S. at 543, 101 S.Ct. at 1916; *PFZ Properties*, 928 F.2d at 31. Puerto Rico did provide post-deprivation process. Thus, Puerto Rico law allowed appellants to ask for reconsideration and it afforded them judicial review in the courts of the Commonwealth where they could challenge the alleged administrative abuses. Appellants sought and obtained judicial review and were successful in some respects. For the reasons explained in *PFZ Properties*, therefore, appellants' procedural due process claim in respect to denial of all three permits is without merit. *See also Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988); *Bello v. Walker*, 840 F.2d 1124, 1127–28 (3d Cir.1988) (both cases rejecting procedural due process claims in similar circumstances).

### B. *First Amendment*

██ This court has never had occasion to consider whether the denial of a land use permit in unjustifiable retaliation for the applicant's expressions of his political views is a First Amendment violation. However, the proposition follows from earlier precedents. In *Packish v. McMurtrie*, 697 F.2d 23 (1st Cir.1983), a town allegedly refused to pay for a fire fighter's injuries because of earlier statements he had made criticizing the town, and this court (although affirming a grant of summary judgment for defendants) held that "[w]hile the Selectmen had discretion with regard to indemnification, they could not refuse a claim in retaliation for the exercise of first amendment rights." *Id.* at 25 (citing *Mount Healthy City School District*

fied).

*Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977)). The same general principle would apply to a retaliatory refusal to grant a permit. *See Chiplin Enterprises v. City of Lebanon,* 712 F.2d 1524 (1st Cir.1983). In *Chiplin,* without raising any First Amendment claim, plaintiff claimed that a city had failed to comply with its own land use laws in delaying his permit to build an apartment building. Affirming the dismissal of plaintiff's constitutional claims, we nonetheless acknowledged that "additional factors might give rise to genuine constitutional issues in cases of this sort" and cited *Packish. Id.* at 1527.

We turn next to the question whether, viewing the facts in the light most favorable to Cerame Vivas, the facts alleged in his complaint, as amplified in the record, suffice to make out a claim that a permit was denied in retaliation for his exercise of First Amendment rights. In answering that question, it may be helpful to follow, by analogy, the Supreme Court's analysis in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), establishing the standards of proof in employment discrimination cases. In *McDonnell Douglas* the Court held that an employee makes out a prima facie case of racial discrimination by showing that (i) he belongs to a racial minority, (ii) he was qualified for a job for which the employer was seeking applicants, (iii) he was rejected, and (iv) the employer continued to seek applicants of similar qualifications. The employer may rebut the employee's prima facie case by showing a "legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. If the employer makes such a showing, the employee may, in turn, show that the alleged nondiscriminatory reason was a pretext. *Id.* at 804, 93 S.Ct. at 1825.

### 1. Residential Permit

■ Turning first to denial of the *residential* site permit, we believe that Cerame Vivas can be said to have stated a prima facie case of denial in retaliation for his political expressions. He says he is an outspoken member of an opposition political party and a critic of the government's environmental policies. The permit application was modified, at least in part, to conform to the PRPB's concerns expressed in its original denial of the permit, so that Cerame Vivas was "qualified" for the permit. Finally, and most critical in this context, the permit was allegedly denied "despite the routine grant of similar requests as to neighboring properties in the area." This latter assertion, supported by some factual allusions, is key because it indicates the possibility of an illegal motive—that something about Cerame Vivas, perhaps his political views, caused him to be denied what otherwise would routinely have been granted.

The defendants have attempted to rebut by asserting that the permit was denied, substantively, for lack of sewer facilities in the area. However, the evidence that the sewer issue was never raised in the initial stages of consideration, and the short time (one week) within which the original denial was made, raises an arguable question of pretext.

We conclude that Cerame Vivas's First Amendment claim concerning denial of the residential permits was pleaded with sufficient particularity to entitle him to survive summary judgment at this stage and to conduct further discovery. This is not to say that he has yet established his right to trial. The facts in support of Cerame Vivas's allegation that permits were routinely granted for other, similar properties are, at best, sketchy. There is merely a short list of other projects which were approved, giving almost no explanation of how these projects were similar to Cerame Vivas's project. *See generally Manego v. Cape Cod Five Cents Savings Bank,* 692 F.2d 174 (1st Cir.1982) (disco and skating rink were sufficiently different that denial of permit for the former to black applicant despite granting of permit for the latter to white applicant did not raise inference of race discrimination). However, because the district court denied further discovery on this point (*see supra*), we think the appropriate course is to remand for such discovery. After discovery is completed,

defendants may renew their motion for summary judgment.

## 2. Hazardous Waste Permit

 We turn next to Cerame Vivas's claim that the hazardous waste permit was denied in retaliation for his political expression, in violation of the First Amendment. We think summary judgment was properly granted as to this permit and that further discovery was not required. There are two critical differences between the allegations and supporting materials in the record concerning that permit and those concerning the residential permit. First, although Cerame Vivas alleged that he was qualified for the hazardous waste permit, he neither alleged nor offered any facts to show that similar permits had been granted to similarly qualified applicants.[4] The project was obviously very controversial, causing a great local stir. The mere denial of a permit—even to an outspoken member of the opposition party who insists and offers to prove that he was qualified to receive it—is not by itself enough to suggest an improper motive. Only when accompanied by other facts, such as that others with no different qualifications were granted a permit, is the allegation sufficiently suggestive of retaliation for First Amendment activity. Mere broad conclusory allegations of wrongdoing in the complaint are not a substitute for a meaningful factual context.

Second, although the complaint alleges *"partisan* political" discrimination, the facts alleged and presented are equally or more consistent with showing simply that the project engendered much local opposition, including vocal opposition by interested politicians. Such opposition is protected, not barred, by the First Amendment. Political representatives are plainly entitled to manifest opposition to permits of this type. Even if it were shown that politicians illegally pressured the Board into denying the permit (and there is no allegation to this effect), this by itself would not demonstrate a violation of the First Amendment. Such a violation would occur only if the reason for the Board's denial of the permit was to retaliate against Cerame Vivas for his own political expression. While both the facts alleged in the complaint and certain materials in the record suggest that PDP politicians attempted to influence the PRPB permitting process, this interference could just as likely—or more likely—have been based on the widespread popular hostility to the project as on retaliation for Cerame Vivas's political expression. A number of Ponce residents opposed the project, demonstrating against it and intervening in the PRPB permitting process. The PDP politicians who expressed opposition to the project all had strong ties to the City of Ponce. The governor himself was a native of Ponce, and Ponce's senator, representative and mayor all opposed the project. No PDP politicians from outside of Ponce are alleged to have opposed the project, nor is it even alleged that politicians from Ponce who belong to Cerame Vivas's own party, the NPP, supported it.

We do not find, therefore, that either the factual allegations in the complaint or those presented in the record, establish a prima facie case of retaliation for Cerame Vivas's expression of political views. Moreover, even supposing that Cerame Vivas were to have established a prima facie case, the defendants have asserted a powerful "nondiscriminatory" reason in rebuttal—the opposition of prominent Ponce politicians who wanted to keep the dump out of

---

**4.** Cerame Vivas's brief represents that a similar permit was granted in the neighboring town of Penuelas. However, Cerame Vivas points to nothing in the complaint or the record to back up this representation. Although the brief purports to do so with a citation to the complaint, the brief cites merely to that portion of the complaint alleging that permits were routinely granted to facilities similar to the residential facility proposed by Cerame Vivas. The only cited materials in the record concerning the Penuelas facility indicate that, following action by the Environmental Protection Agency, the facility was going to be closed. No information is provided concerning PRPB permitting for the Penuelas facility. *See Mendez v. Belton,* 739 F.2d 15 (1st Cir.1984) (critical factual assertions must be supported by a reference to appendix or record). Furthermore, we see no relevance to Cerame Vivas's conclusory allegations concerning municipal—as opposed to privately operated—waste disposal facilities.

their "backyard." Nothing presented by Cerame Vivas, other than sheer conclusory allegations, addresses this. While political interference for any reason may be unpalatable, this would not violate the First Amendment nor, as discussed later, would it be otherwise unconstitutional. There is little to suggest, moreover, that this "nondiscriminatory" reason is pretextual, leaving as the "true reason" for permit denial a desire to retaliate against Cerame Vivas's political expressions. Stopping the project rather than punishing Cerame Vivas's speech seems both the most logical inference and one that is wholly consistent with the alleged irregularities in the permitting process, i.e., the long delays and the denial of the permit despite its asserted conformity with the Criteria and the recommendation of several government agencies.

Because Cerame Vivas did not make out a prima facie case, and because the factual allegations at most suggest political pressures based merely on local opposition, summary judgment was correctly granted on the First Amendment claim for denial of the hazardous waste permit.

### 3. Domestic Waste Permit

The complaint and record are even less supportive of a First Amendment claim regarding the domestic waste disposal permit. The record contains almost no facts concerning that permit. The complaint merely alleges that it was denied without consideration and without conclusions of law applicable specifically to it, as opposed to the hazardous waste facility. Again, plaintiffs have failed to set out facts for a prima facie case; there is no allegation that similar permits were granted to other private applicants. Moreover, the complaint does not allege any facts inconsistent with the district court's conclusion that this denial was due to the defendants' assumption that the domestic waste facility would not be built if the hazardous waste permit was not granted. Therefore, summary judgment was correctly granted as to that permit.

### C. *Equal Protection*

Cerame Vivas claims that denial of all three types of permits violated his right to equal protection of the laws. With respect to both the hazardous and domestic waste disposal permits, the complaint alleges that appellants were given process and treatment "in a manner that differs invidiously from the process and treatment accorded to others similarly situated." With respect to the residential permit, the complaint alleges that the PRPB "routine[ly] grant[ed] ... similar requests as to neighboring properties in the area," and repeats the allegation of treatment "that differs invidiously." We reject the equal protection claims as to all of the permits.

Regarding both waste permits, Cerame Vivas points to no allegations of fact in the complaint, nor to anything in the record, bearing out the conclusory assertion that others similarly situated were treated differently from himself. It follows that there can be no equal protection violation. *See Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 832 (1st Cir.1982) (rejecting equal protection and due process claims because "no rival developer advocating [plaintiff's] ambitious plan would have had more success"), *cert. denied*, 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54 (2d Cir.1985) (no equal protection violation where junkyard operator alleged zoning board wanted his application "killed" but did not allege others were treated differently); *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989).

With respect to the residential permit, the question is more difficult, as the record indicates that permits for similar projects may have been granted to others in the area. *See supra.* In *Cordeco Development Corp. v. Santiago Vasquez*, 539 F.2d 256 (1st Cir.), *cert. denied*, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976), defendants delayed issuing a sand extraction permit to the plaintiff and then issued a permit with limitations making it essentially worthless. At the same time, defendants issued a proper permit to members of a politically influential family that owned

neighboring land. An advisory jury concluded that this constituted a denial of equal protection, and this court affirmed, holding that the evidence supported a finding that defendants acted "with illegitimate 'political' or, at least, personal motives...." *Id.* at 260. However, in a footnote, one panel member expressed reservations about this holding because "the paucity of cases [since the 1940's] equating equal protection violations with instances of bribery and conflict of interest by state officials suggests that the matter may not, even yet, be finally settled." *Id.* at 260, n. 5.

Since *Cordeco*, this court and many others have rejected equal protection claims in contexts similar to that at issue here. However, courts have left room for such claims in cases involving "invidious discrimination." In *Creative Environments*, 680 F.2d at 822–29, plaintiff sought to build an 80–unit housing development with an unorthodox design in a small town in Massachusetts. The necessary permits were denied, plaintiff alleged, due to fear of social effects on the community and the political threat of the proposed homeowners' association. This court, assuming arguendo that the permitting process had been "adversarial and even arbitrary," rejected plaintiff's constitutional claims. *Id.* at 829. The court noted that the "federal basis for liability" had never been expressly litigated in *Cordeco*, and that *Cordeco* differed on its facts. *Id.* at 832. Thus, the court rejected plaintiff's constitutional claims because the dispute was "too typical of the run of the mill dispute between a developer and a town planning agency ... to rise to the level of a due process violation." *Id.* at 833. Finally, however, the court stated in a footnote that "[a] different situation may be presented in some instances, particularly in the realm of equal protection, involving gross abuse of power, invidious discrimination, or fundamentally unfair procedures." *Id.* at 832, n. 9.

Our opinion in *PFZ Properties* expanded on this footnote. The court noted the "suggestion" in *Creative Environments* that an equal protection claim could be made out in certain circumstances but held that plaintiff had alleged

no facts that would suggest discrimination based on an invidious classification such as race or sex, nor [had it alleged] the type of egregious procedural irregularities or abuse of power mentioned by *Creative Environments* as conceivably rising to the level of a federal equal protection violation.

928 F.2d at 32.

Here, the alleged irregularity or abuse most likely to be considered "invidious" or "egregious" was the withholding of the residential site permit in purported retaliation for Cerame Vivas's political views. We have already held that this asserted discrimination stated a First Amendment claim sufficient to warrant further discovery. *Supra.* Does the identical conduct also state an equal protection claim? We think not. Although *PFZ Properties* left room for an equal protection claim in cases involving "invidious discrimination," or "egregious abuse of power," that case indicated that "invidious discrimination" meant discrimination based on race, sex or like classifications.[5] Race and sex are the traditional classifications which trigger so called "strict" or "intermediate" scrutiny, under which courts engage in a detailed analysis of the reason for a legislative classification. *See, e.g., Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984) (race); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (sex). We see no justification for enlarging this category so as to accommodate the current claim.

There is an obvious danger to opening up local permitting decisions to detailed federal judicial scrutiny under equal protection rubric. If disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differ-

**5.** We hold later in this opinion that defendants' alleged conduct was not so egregious as to constitute a substantive due process violation. For the same reasons, we find no "egregious abuse of power" for equal protection purposes, assuming without deciding that such abuses might, by themselves, constitute equal protection violations.

ently from a similarly situated applicant, the correctness of virtually any state permit denial would become subject to litigation in federal court. Limiting such claims is essential to prevent federal courts from turning into "zoning board[s] of appeals." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 12, 94 S.Ct. 1536, 1542, 39 L.Ed.2d 797 (1974) (Marshall, J. dissenting).

Here, Cerame Vivas has no need for protection under the equal protection clause. His equal protection theory is simply that, in addition to violating his First Amendment rights, the denial of permits in purported retaliation for his political expression violated his equal protection rights as well. Given the overlap of these claims, and the vast problems that would be created, we see little basis or justification for applying equal protection analysis in the present situation.

### D. *Substantive Due Process*

Plaintiffs' final constitutional claim is for a violation of their substantive due process rights. We hold that summary judgment was correctly granted as to this claim in respect to all three permits.

We recently summarized the law of substantive due process in the permitting context in *PFZ Properties:*

> rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process. [citations omitted]. Even where state officials have allegedly violated state law or administrative procedures, such violations do not ordinarily rise to the level of a constitutional deprivation. [citation omitted]. The doctrine of substantive due process "does not protect individuals from all [governmental] actions that infringe liberty or injure property in violation of state law. Rather, substantive due process prevents 'governmental power from being used for purposes of oppression,' or 'abuse of government power that shocks the conscience,' or 'action that is legally irrational in that it is not sufficiently keyed to any legitimate state interests.' "

928 F.2d at 31–32 (citing *Committee of U.S. Citizens in Nicaragua v. Reagan*, 859 F.2d 929, 943 (D.C.Cir.1988) (citations omitted)).

Substantive due process, as a theory for constitutional redress, has in the past fifty years been disfavored, in part because of its virtually standardless reach. To apply it to claims like the present would be to insinuate the oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals. Clearly, it is no simple matter to decide what abuses to regard as abuses of "substantive" due process. Every litigant is likely to regard his own case as involving such an injustice. Thus, we have consistently held that the due process clause may not ordinarily be used to involve federal courts in the rights and wrongs of local planning disputes. In the vast majority of instances, local and state agencies and courts are closer to the situation and better equipped to provide relief. We have left the door slightly ajar for federal relief in truly horrendous situations. But this circuit's precedent makes clear that the threshold for establishing the requisite "abuse of government power" is a high one indeed. In *Amsden v. Moran*, 904 F.2d 748 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991), an architect alleged that his license had been revoked because state officials sought to force his partner out of business. In deciding an issue of qualified immunity, the court suggested that such action, although it may have constituted a "bad faith violation[ ] of state law," was not sufficiently conscience shocking to rise to the level of a substantive due process violation. *Id.* at 757. Likewise, in *Creative Environments* the plaintiffs alleged that a reason for the denial was defendants' fear of the political threat of the proposed homeowner's association. The court rejected plaintiffs' substantive due process claim, characterizing the town officials' motivation as merely a "parochial view[ ] of local interests" which did not constitute a substantive due process violation. 680 F.2d at 832.

■ To the extent Cerame Vivas's substantive due process claim is based on the alleged retaliation for his political views, it is coextensive with his First Amendment claim. Should that claim turn out to be viable in regard to the residential site permit, *supra*, there is obviously no need to enter the uncharted thicket of substantive due process to find an avenue for relief, and we decline to do so.

■ In respect to the waste disposal permits, Cerame Vivas has failed to make a case that any political interference in the permitting process stemmed from a desire to stifle or retaliate for his speech-related activities. *Supra.* The substantive due process claim must rest on suggestions of political manipulation of the permitting process aimed, not at retaliation against Cerame Vivas because of his political views, but simply at stopping the project for some other reason, such as popular opposition to a dump of this nature. As noted, the project stirred up opposition by many elements of the local community. The question thus arises whether allegations of political interference with the permitting process alone give rise to a substantive due process claim. We think not, on this record. To hold otherwise would establish a precedent for federal courts to adjudicate planning disputes whenever it is plausibly alleged that political considerations have played a role in a permit denial. Not only would this require federal courts to sit as a "zoning board of appeals," *Village of Belle Terre*, 416 U.S. at 12, 94 S.Ct. at 1542, it would also involve them in political disputes better left to local governments. Drawing the line between political interference prohibited by the Constitution and that of lesser magnitude would involve courts in virtually impossible line drawing. As Judge Posner has noted:

> nothing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic ... government, operations which are permeated by pressure from special interests.

*Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir.1988). *See also Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1579 (11th Cir.1989).

We are aware that in certain special circumstances a few other courts of appeals have found substantive due process violations in the local land-use permitting context. In *Brady v. Town of Colchester*, 863 F.2d 205 (2d Cir.1988) plaintiffs leased a building to the Borough of Colchester, a political entity within the Town of Colchester. Town officials then revoked plaintiffs' building permit and required plaintiffs to apply for various other permits allegedly necessary for plaintiffs to lease the building to the Borough. The Borough was Democratic, and the Town Republican, and the two had been involved in a number of political disputes. Moreover, the Town Chairman had tried to rent his own building to the Borough, but had been turned down in favor of the plaintiffs. The Second Circuit reversed a grant of summary judgment for defendants, holding that substantive due process could be violated if "impermissible political animus" was the reason for the Town's actions. 863 F.2d at 216.

Likewise, in *Bello v. Walker*, 840 F.2d 1124 (3d Cir.1988), plaintiff claimed that a city council member had caused city officials to deny a building permit to plaintiff because one of·plaintiff's employees had opposed the council member in a recent election. The Third Circuit reversed the district court's grant of summary judgment for defendants, holding that a substantive due process claim could be made out if municipal officials "improperly interfered with the process by which the municipality issued building permits ... for partisan political or personal reasons unrelated to the merits of the application...." 840 F.2d at 1129.

■ To the extent these cases indicate that a denial of a land-use permit in retaliation for political expression constitutes a substantive due process violation, we disagree. We believe such conduct is better addressed in terms of· the First Amendment; there is no need to turn to the due

process clause. To the extent these cases indicate that the consideration of certain other factors by local permitting authorities can implicate substantive due process, they appear to deal with concerns very different from those at issue here. The political interference in both cases was based, at least in part, on personal hostility toward the applicants. In *Brady*, plaintiffs had taken a business opportunity from the Town Chairman, and in *Bello* the plaintiff's employee had challenged the council member's reelection.

In this case, however, there is no issue of fact as to any personal reasons for the waste permit denials. *See supra.*[6] For all that reliably appears, any other developer would have faced the same obstacles as Cerame Vivas. Rather than taking into account personal considerations, the PRPB, at most, may have taken into account the fact that politicians from Ponce were opposed to the project. While this could plausibly be characterized as "political animus," *Brady*, 863 F.2d at 216, it is "political animus" of a different sort than that at issue in *Brady* and *Bello*. Political opposition was based on the fact that a large number of Ponce residents did not want a hazardous waste dump in Ponce. Moreover, in the case of the Senate Committee, political opposition was based on a detailed assessment of the merits of the projects, reached after hearings at which Cerame Vivas himself testified. This is, at worst, political decision making based on the sort of "parochial view[ ] of local interests" held not to violate substantive due process in *Creative Environments.* 680 F.2d at 832.[7]

Nor is the present case one involving facts indicating that PRPB officials were bribed or were threatened by the political leaders. Whether and in what circumstances such conduct might violate the due process clause is an issue we need not and do not consider. The allegations in the complaint and the materials in the record indicate merely that the PRPB officials had been appointed by and worked in the office of a PDP governor, and that certain PDP politicians participated in demonstrations, held hearings, made speeches, and wrote letters, all in opposition to the project. That is what politicians are paid to do. For federal courts to attempt to regulate, as a matter of *substantive* due process, the permissible extent to which government administrators may take such opposition into account would seriously embroil them in unpromising and unwarranted efforts to tailor the democratic process.

The district court's judgment of February 15, 1991 granting defendants' motion for summary judgment is affirmed in its entirety as to Count One of the amended complaint (relating to the waste disposal permits), and as to the equal protection and substantive and procedural due process claims in Count Two (relating to the residential permit). The judgment is vacated as to the claim for denial of the residential permit in violation of the First Amendment, and that part of the case is remanded for the reopening of discovery and the opportunity for a rehearing on the existence of a triable issue.

*So ordered. No costs.*

---

**6.** In so saying, we mean to take no view as to whether or not we agree with the reasoning in *Brady* and *Bello.*

**7.** To be sure, it would be objectionable for a supposedly neutral body to deny the issuance of a permit based on the opposition of certain politicians and local residents, rather than doing so based on the regulations under which it operates. In some circumstances, such conduct could possibly violate procedural due process. *See generally Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (hearing examiner who determines whether to terminate welfare benefits must be impartial and may not consider evidence outside the record). (In this case, plaintiffs' procedural due process rights were adequately protected by their right of review in the Puerto Rico courts. *See supra.*) But *substantive* due process, rather than regulating the procedures by which government acts, forbids certain kinds of government actions altogether. Whatever the reach of this constitutional provision, it does not forbid government decision making based on the "political" considerations at issue here.