Andrés GUILLEMARD–GINORIO; María M. Noble–Fernández; Conjugal Partnership Guillemard–Noble; Lone Star Insurance Producers, Inc., Plaintiffs, Appellees,

Jorge R. Urrutia–Vallés; Carolyne J. Wiewall–Navas; Conjugal Partnership Urrutia–Wiewall' Urrutia Vallés, Inc., Plaintiffs,

v.

Fermín M. CONTRERAS–GÓMEZ, Individually; Dorelisse Juarbe–Jiménez; Individually and as Insurance Commissioner of Puerto Rico; Office of the Insurance Commissioner, Defendants, Appellants,

María Awilda Quintana; Conjugal Partnership Contreras–Doe; Conjugal Partnership Báez–Juarbe; José Báez; Jane Doe 03CV2390; Annabelle Rodríguez, Defendants.

No. 08–1302.

United States Court of Appeals, First Circuit.

Heard Jan. 9, 2009.

Decided Oct. 29, 2009.

---

Carlos A. Del Valle–Cruz, Special Counsel, Department of Justice, with whom Roberto J. Sánchez–Ramos, Secretary of Justice, Commonwealth of Puerto Rico, and Maite Oronoz–Rodríguez, Acting Solicitor General, was on brief for appellants.

Joseph D. Steinfield, with whom Jeffrey J. Pyle, Prince, Lobel, Glovsky & Tye, LLP, Joan S. Peters and Nachman & Guillemard, was on brief for appellees.

Before TORRUELLA, Circuit Judge, SILER,* Senior Circuit Judge, and HOWARD, Circuit Judge.

TORRUELLA, Circuit Judge.

Plaintiffs-appellees, Andrés Guillemard–Ginorio ("Guillemard") and his wife, María Noble–Fernández ("Noble"), along with their jointly-owned insurance agency, Lone Star Insurance Producers, Inc. ("Lone Star"), brought suit against defendants-appellants, the Office of the Insurance Commissioner of Puerto Rico ("OIC") and two consecutive Insurance Commissioners, Fermín Contreras–Gómez ("Contreras") and Dorelisse Juarbe–Jiménez ("Juarbe"), individually and in their official capacities, alleging, inter alia, that defendants investigated and sanctioned them for purported Insurance Code violations solely because of their political affiliation with the New Progressive Party ("NPP"). The complaint included federal claims under the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 (" § 1983") along with supplemental claims for relief under the Commonwealth Constitution. Following a jury trial, plaintiffs were awarded a $4.7 million money judgment as well as permanent injunctive relief. It is from this judgment, the permanent injunction, and the denial of their post-trial motions, that defendants now appeal.

Defendants raise numerous grounds for relief. After careful consideration, finding none meritorious, we affirm.

## I. *Background*

Plaintiffs Guillemard and Noble are husband and wife. Both are licensed insurance agents in Puerto Rico, each owning 50% of Lone Star, an insurance agency licensed to do business in Puerto Rico. Both Guillemard and Noble are prominent members of the NPP, having contributed substantial time and financial support to NPP candidates. Defendant Contreras is the former Insurance Commissioner of the Commonwealth of Puerto Rico, having served in that capacity from March 2001 to December 31, 2003. He was succeeded on January 7, 2004 by defendant Juarbe, who served as Insurance Commissioner until

* Of the Sixth Circuit, sitting by designation.

December 2008, when a new administration came to power. Both Contreras and Juarbe served under Popular Democratic Party ("PDP") administrations. The NPP and PDP are opposing political parties in Puerto Rico.

Lone Star first began doing business with government agencies in 1993, when it was the agency that placed insurance for the Puerto Rico Ports Authority. In 1994, the government of Puerto Rico determined that public authorities and government agencies should be represented by licensed insurance brokers for the purpose of obtaining insurance. It thus moved from an open bidding process to a brokered system where a handful of brokers were selected to handle all government insurance. Based on testimony presented at trial, Guillemard met with then Commissioner of Insurance Juan Antonio García, who advised him to affiliate with a government insurance broker and suggested he do so with Urrutia Vallés, Inc. ("UVI"),[1] one such broker licensed in Puerto Rico.[2] In 1994, Lone Star entered into a consortium with UVI. Testimony and exhibits at trial established that "from 1994 to approximately April 2001, [UVI], acting on behalf of the consortium, negotiated insurance policies and provided related insurance services to several government agencies and public corporations." Lone Star and UVI shared commissions on premiums for insurance of the kind that plaintiffs were licensed to solicit. There was evidence at trial showing that OIC and the governmental agencies were aware of the arrangement between Lone Star and UVI.

A change of government took place during the 2000 general election, bringing into power the PDP administration of Governor Sila M. Calderón. In May 2001, then Treasury Secretary Juan Flores Galarza announced an investigation of all insurance entities which had been providing insurance services to government agencies during the previous administration. UVI was named as a target of that investigation and, on November 2, 2001, the OIC assigned Angela Rivera to investigate UVI for its conduct in connection with the performance of a contract with the government of Puerto Rico. Pursuant to that investigation, Rivera found evidence suggesting that UVI paid commissions to Lone Star from the sale of the government insurance policies.

On November 20, 2001, then Insurance Commissioner, Contreras, issued a "Notification and Examination Order" calling for an investigation of Lone Star's operations and transactions from January 1, 1997 through September 30, 2001. The notification did not include any charges of wrongdoing. Pursuant to that investigation, David Castro Anaya ("Castro"), an OIC auditor, was assigned to perform the Lone Star audit. Castro reviewed Lone Star's transactions for the relevant period, including all documents pertaining to insurance provided to government agencies. Plaintiffs fully cooperated with Castro's investigation. According to Castro's own testimony at trial, the sole purpose of his investigation was to determine whether Lone Star had made improper payments such as bribes to third parties. Castro

---

1. UVI and its principals, Jorge R. Urrutia Vallés ("Urrutia") and Carolyn J. Wiewall Navas, were also previously plaintiffs in this litigation but, at their request, their action was dismissed by the district court on November 12, 2004. *See Guillemard v. Contreras,* 161 Fed.Appx. 24, 26 n. 2. (1st Cir.2005) (per curiam).

2. Insurance brokers, such as UVI, work to obtain insurance on behalf of the insured, in this case, the Government of Puerto Rico. Insurance agents, such as Lone Star, work on behalf of the insurers.

never found any such payments. By December 17, 2001, Castro concluded his audit. Castro informed Guillemard that he had found no irregularities and that he would prepare a final report in early 2002 and send Guillemard a copy.

On July 10, 2003, Castro submitted his report relating to the Lone Star audit to his supervisor, which was entitled "Final Investigation Findings Report." The Report made no reference to improper payments to third parties, but found that Lone Star had entered into a commission-sharing arrangement with an insurance broker, UVI, thereby deriving substantial commissions from policies insuring the risks of the Commonwealth. The Report concluded that the sharing of commissions was a violation of Section 939 of the Puerto Rico Insurance Code. *See* P.R. Laws Ann. tit. 26, § 939 (2003) (repealed by Law No. 10 of Jan. 19, 2006, Art. 8). A copy of the report was not sent to Guillemard, and thus, Guillemard had no opportunity to object to its contents.

According to his own testimony at trial, at some point after November 20, 2001, but before March 2002, Melvin Rosario Crespo ("Rosario"), the Director of the Anti–Fraud Unit at the OIC and Castro's supervisor, met privately with Contreras regarding the Lone Star investigation and told Contreras that he "did not feel comfortable with the legal grounds for such an investigation." Rosario explained that the sharing of commissions, as in the case of Lone Star and UVI, was common and normal in the way that business was conducted and that he had not found anything in the Insurance Code prohibiting it. Rosario testified that he told Contreras that "there was no legal grounds for this type

of investigation" and thus, he did not wish to investigate Lone Star for commission sharing. In response, Contreras told Rosario that he would "have to go after this NPP" anyway. Rosario asked to be relieved from the assignment, and Contreras agreed that Castro would report to Aurea López instead.

During the course of the investigation, defendants Contreras and Juarbe also issued ex parte subpoenas to various Puerto Rico banks and obtained documents concerning the business and personal accounts of Guillemard and Noble. Many of these accounts had nothing to do with Lone Star's business. Defendants did not give plaintiffs prior notice of the subpoenas, nor did they obtain any court orders authorizing such subpoenas.

In early 2003 plaintiffs learned that Contreras and the then, Sub-commissioner, Juarbe, had issued the ex parte subpoenas and obtained documents concerning Guillemard's and Noble's business and personal accounts.[3] Guillemard also learned that Contreras had made disparaging remarks regarding his and Noble's political affiliation. On December 10, 2003 plaintiffs filed the instant suit in the Federal District Court for the District of Puerto Rico pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983 against the OIC and against Contreras for damages in his individual capacity and injunctive relief in his official capacity, alleging, inter alia, that Contreras' investigation was motivated by political animus toward Guillemard in violation of the First and Fourteenth Amendments and that the subpoenas constituted an invasion of privacy under local law. Contreras was served with summons on December 19, 2003. At that time, the OIC

---

**3.** The subpoenas had been issued in January 2002. On March 6, 2003, plaintiffs moved to quash the subpoenas in Commonwealth Court, but on October 31, 2005, the Court of First Instance found in favor of the OIC, and the Commonwealth Court of Appeals affirmed.

had not issued any charges, reports or orders in connection with the Lone Star investigation.

On December 23, 2003, Contreras, without affording plaintiffs notice or a hearing, issued an Order against plaintiffs charging them with various violations of the Insurance Code ("the Order"). Juarbe, who was then the Sub–Commissioner, attended the meetings leading up to the issuance of the Order. The Order (1) revoked the plaintiffs' insurance licenses for a five-year period; (2) prohibited further license applications during that period; (3) declared plaintiffs "incompetent" and "untrustworthy"; and (4) fined them more than $2 million. The Order also provided that plaintiffs could request an administrative hearing to contest the Order. Such request for administrative relief would stay the imposition of the fine, but the license revocation would remain in effect pending a final administrative decision. Plaintiffs filed an administrative appeal of the Order with the OIC.[4]

Following the issuance of the Order, on December 30, 2003, plaintiffs amended their federal complaint to allege, among other things, retaliation under the First Amendment and violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as additional state law provisions.[5] They also

moved for a preliminary injunction against the enforcement of the Order, pending the administrative appeal. After an evidentiary hearing held on February 4, 2004, the court issued a preliminary injunction enjoining the revocation of plaintiffs' licenses pending completion of a full and fair pre-deprivation administrative hearing. *Guillemard v. Contreras*, 301 F.Supp.2d 122, 134 (D.P.R.2004).[6] Defendants, in turn, moved for dismissal of the complaint on various grounds, including the *Burford* and *Younger* abstention doctrines and their alleged entitlement to sovereign, absolute and qualified immunity. The court denied the motion, *Guillemard v. Contreras*, 322 F.Supp.2d 153, 164 (D.P.R.2004), and upon defendants' interlocutory appeal, we affirmed. *Guillemard*, 161 Fed.Appx. at 29.[7] In relevant part, with respect to Contreras' sovereign immunity claim, we held that while it is true that "sovereign immunity shields an officer in his official capacity from monetary damages ... plaintiffs' complaint also seeks declaratory and prospective injunctive relief against him and such claims are not barred by sovereign immunity." *Id.* at 27 n. 7. With respect to Contreras' argument for qualified immunity on the due process claims, we affirmed the district court's conclusion that Contreras was not entitled to such immunity. *Id.* at 28. We held that "the district court

---

4. Guillemard testified that as a result of the issuance of the Order he lost various clients and that it "practically closed [him] down in [his] insurance business."

5. Plaintiffs also amended the complaint on June 6, 2004 to add the then current Insurance Commissioner, Juarbe, as a defendant, in her individual and official capacity. They alleged that by not dismissing the charges against them, Juarbe had "adopted and ratified" Contreras' conduct.

6. In the context of the injunction request, the District Court also had to entertain arguments related to defendants' claims regarding *Youn-*

*ger* and *Burford* abstention, which it found inapplicable to the current controversy. *See Guillemard*, 301 F.Supp.2d at 127–31 (Opinion and Order of February 4, 2004).

7. The interlocutory appeal also included a challenge to the issuance of the preliminary injunction, which we dismissed as moot because the OIC administrative hearing, upon which the injunction depended, had already taken place. *Guillemard*, 161 Fed.Appx. at 26–27. We also held that we lacked jurisdiction to reach the abstention issues on the remaining immunity appeal. *Id.* at 27 n. 6.

correctly determined that the complaint alleges at least three constitutional violations, one of procedural due process (deprivation of property without a hearing) and two under the First Amendment (political discrimination and retaliation)." *Id.* We further held that, "given the facts alleged in the complaint," which we must accept as true at the motion to dismiss stage, "we have no difficulty concluding that a reasonable official in Contreras's position would have known that instigating an investigation to punish Lone Star plaintiffs for their political beliefs, and terminating their insurance license without notice or a hearing in retaliation for their filing of a legal action would violate their constitutional rights." *Id.* at 29. Thus, the case was permitted to proceed.

Meanwhile, plaintiffs also filed a timely administrative appeal before the OIC and on March 2, 2004 the OIC held a hearing on the merits of plaintiffs' appeal of the December 23, 2003 Order. On March 4, 2005, Juarbe issued a Resolution sustaining the finding in the Order that plaintiffs had violated the Insurance Code ("the Resolution"). The Resolution, however, reduced the fine amount to $208,000 and the license revocation period to three months. The references in Contreras' Order to plaintiffs' "untrustworthiness" and "incompetence" were eliminated. Plaintiffs appealed to the Puerto Rico Appeals

Court, which upheld the OIC's decision. Plaintiffs appealed again to Puerto Rico's Supreme Court, which, on February 6, 2009 dismissed their appeal, pursuant to a joint motion for dismissal submitted by the parties.[8]

Returning to the federal proceedings, discovery took place and, on May 20, 2005, plaintiffs moved for summary judgment. On June 7, 2005, defendants cross-moved for summary judgment, seeking dismissal of the complaint on qualified immunity and other grounds. Pursuant to an amended Opinion and Order issued on January 10, 2006, accepting in part and rejecting in part a Magistrate Judge's ("MJ") recommendation, the district court granted plaintiffs' motion with respect to liability on the due process claim and denied defendants' motion. *See Guillemard v. Contreras,* 409 F.Supp.2d 101, 112 (D.P.R.2006). The district court held, inter alia, that "summary judgment is warranted in favor of plaintiffs on their due process claims," as it "remains uncontroverted that defendants did not provide plaintiffs with a pre-deprivation hearing" prior to issuing the Order revoking their licenses, and defendants "failed to establish that an emergency situation existed" that could justify such failure. *Id.* at 107.[9] The court rejected defendants' argument that they were entitled to qualified immunity on that claim, *see id.,*[10] and pursuant to defendants' inter-

---

8. This court was apprised of this development pursuant to an informative motion filed by plaintiffs.

9. Defendants later filed a motion to vacate the district court's judgment on the due process claim pursuant to Fed.R.Civ.P. 60(b) based on the newly discovered evidence, namely, a Puerto Rico appellate court decision holding that an interpretation that the Insurance Code prohibits commission sharing was reasonable. On April 3, 2006, the district court denied the motion to vacate, finding that the Puerto Rico appellate court decision was irrelevant to its

ruling. The defendants also appealed this ruling. We held that this argument was only relevant to plaintiffs' political discrimination claim, not their due process claim, and that we lacked jurisdiction to review the district court's denial of the motion to vacate on this issue. *Guillemard v. Contreras,* 490 F.3d 31, 41 (1st Cir.2007).

10. The district court considered defendants' qualified immunity only in relation to plaintiffs' due process claims, finding that defendants' arguments for qualified immunity with respect to the other claims were not properly

locutory appeal in this court, on June 12, 2007, we affirmed.[11] *Guillemard*, 490 F.3d at 41.

The remaining issues were finally tried before a jury between September 17 and October 3, 2007. On October 8, 2007 the jury returned a verdict largely against the defendants and in favor of the plaintiffs.[12] Specifically, having already established liability against both Contreras and Juarbe with respect to the procedural due process claim, the jury entered damages accordingly. The jury also found against Contreras with respect to the First Amendment political discrimination and retaliation claims resulting from the issuance of the December 23, 2003 Order.[13] Specifically, in terms of political discrimination, the jury concluded that plaintiffs had proven "that the political affiliation or activities of Andrés Guillemard were a substantial motivating factor" in Contreras' issuance of the Order, and that Contreras failed to prove that he would have issued the Order "even in the absence of the political affiliation or activities of Andrés Guillemard." With respect to retaliation, the jury found that plaintiffs had proven that "their act of filing this lawsuit was a substantial or motivating factor" in Contreras' decision to issue the Order, and that Contreras failed to prove that "he would have issued [the Order] even if plaintiffs had not filed their lawsuit."

With respect to the Equal Protection Clause claims, the jury found against Contreras on the "selective enforcement" claim, concluding that "Contreras treated the plaintiffs differently than others similarly situated," "that such selective treatment was based on the political affiliation and activities of Mr. Guillemard," and that Contreras failed to prove that "he would have taken the same action even in the absence of Andrés Guillemard's political activities or affiliation." The jury also found against Contreras and Juarbe on plaintiffs' Equal Protection Clause "class of one" claim, concluding that both defendants "intentionally treated the plaintiffs differently from others similarly situated," with "no rational basis for the difference in treatment." With respect to the state law claims, the jury decided in favor of the plaintiffs and against Contreras on the defamation claim, finding that Contreras "negligently published a false and defamatory statement" about Guillemard and Lone Star. The jury also found against all defendants on the state law negligence and privacy claims. A total of $4,755,000.00 was awarded to plaintiffs, of which $3,080,000.00 (65%) corresponds to Contreras and $1,675,000.00 (35%) corresponds to Juarbe.

On December 10, 2007, the Court held a hearing on plaintiffs' Motion for a Permanent Injunction and, on January 8, 2008,

---

raised before the MJ and thus, waived. *Guillemard*, 409 F.Supp.2d at 107. We affirmed that decision. *Guillemard*, 490 F.3d at 37.

**11.** We held that defendants were not entitled to qualified immunity on their due process claim. Although defendants had argued that in summarily revoking plaintiffs' licenses defendants reasonably relied on a Puerto Rico Insurance Code statute, P.R. Laws Ann. tit. 26, § 947(2)(a), which authorizes license revocation without a hearing, we held that such reliance was unreasonable "because the statute is no longer in effect" and, in any event, "because a reasonable official in their posi-

tion would have known that [the statute] violates the Due Process Clause." *Guillemard*, 490 F.3d at 39–41.

**12.** Plaintiffs did not succeed in their "selective enforcement" Equal Protection or First Amendment claims against Juarbe or in their First Amendment claim against Contreras with regard to the investigation.

**13.** With respect to plaintiffs' "political discrimination" First Amendment claim arising from *the investigation*, the jury found in favor of the defendants.

relying on the jury's findings at trial, issued an order that (a) enjoined the then serving Commissioner, Juarbe, from taking further action to enforce her March 4, 2005 Resolution; (b) ordered Juarbe to withdraw and revoke said resolution; and (c) prohibited Juarbe from enforcing outstanding subpoenas issued by the OIC against the plaintiffs. *Guillemard v. Contreras*, No. 03–2317 (D.P.R. Jan. 8, 2008).

Defendants, in due course, filed motions for a new trial, judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), and remittitur pursuant to Fed.R.Civ.P. 59(e). In addition to challenging the sufficiency of evidence supporting the jury's verdict, and the amount of the damages award, defendants again argued for entitlement to qualified immunity. In an Opinion and Order dated June 13, 2008, the district court denied each motion. *Guillemard v. Contreras*, No. 03–2317 (D.P.R. June 13, 2008). Amended Final Judgment was entered on June 17, 2008.

Defendants timely appealed. On appeal, defendants raise various claims for relief resting on the district court's alleged error in not abstaining pursuant to the *Younger* or *Burford* abstention doctrines, in declining to recognize defendants' entitlement to qualified and/or sovereign immunity, in permitting the entry of judgment on over-lapping claims, and in making certain evidentiary rulings. Defendants, however, do not challenge on appeal either the sufficiency of the evidence supporting the jury's verdict or the damage amount awarded.

## II. *Discussion*

### A. Abstention

Defendants' first line of attack upon the proceedings below relies on the *Younger* and *Burford* abstention doctrines. *See Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). They argue that the district court ought properly to have abstained from issuing injunctive relief or permitting the action for damages to go forward against the Commissioners.[14] "[W]e must review de novo the [district court's] essentially legal determination of whether the requirements for abstention have been met." *Esso Standard Oil Co. v. Cotto*, 389 F.3d 212, 217 (1st Cir.2004) (quoting *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 637 (1st Cir. 1996)). Nonetheless, the district court's findings of fact and applications of law, as opposed to its ultimate legal conclusions, evoke a more deferential standard of review. *See Sevigny v. Employers Ins. of*

---

14. There is mixed authority on the question of whether abstention doctrines are only available to challenge the exercise of a federal court's *equitable* power, or alternatively, whether they may apply to actions for damages as well. *See, e.g., Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (describing *Burford* abstention, "as with other abstention doctrines," as "deriv[ing] from the discretion historically enjoyed by courts of equity"); *id.* at 731, 116 S.Ct. 1712 (stating generally, though in the context of *Burford* abstention discussion, that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary"); *Deakins v. Monaghan*, 484 U.S. 193, 202, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) (declining to decide "the extent to which the *Younger* doctrine applies to a federal action seeking only monetary relief"); *DeMauro v. DeMauro*, 115 F.3d 94, 98 (1st Cir.1997) (citing *Quackenbush* for proposition that "in a damages action, the district court may only order a stay pending resolution of state proceedings; it cannot invoke abstention to dismiss the suit altogether"). Concluding, as we do, that abstention is unwarranted here in any event, we need not go further in unraveling these complexities.

*Wausau,* 411 F.3d 24, 26–27 (1st Cir.2005); *Brooks,* 80 F.3d at 637 & n. 4.

■ "[A]bstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 292, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). These doctrines call upon federal courts to decline to exercise their properly held jurisdiction in circumstances where the interests of comity and federalism predominate. *See Quackenbush,* 517 U.S. at 727–28, 116 S.Ct. 1712. As a general matter, this court has held that abstention should be "the exception, not the rule." *Fragoso v. López,* 991 F.2d 878, 883 (1st Cir.1993). Likewise, the Supreme Court has held that the balance of state and federal interests "only rarely favors abstention." *Quackenbush,* 517 U.S. at 728, 116 S.Ct. 1712; *see also Deakins,* 484 U.S. at 204, 108 S.Ct. 523 (noting that only "extraordinary circumstance[s] ... may justify abdication of the 'virtually unflagging obligation ... to exercise the jurisdiction given' the federal courts") (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)).

The threshold issue is whether defendants' abstention arguments are properly before us on appeal. Plaintiffs contend that the last time defendants properly raised the abstention issue before the district court was in a motion to dismiss filed in early 2004, and that, pursuant to *Eastern Mountain Platform Tennis, Inc. v. Sherwin–Williams Co., Inc.,* 40 F.3d 492, 497 (1st Cir.1994), a legal argument made in a dispositive motion is not preserved for appeal unless perfected by its inclusion in a motion for judgment as a matter of law filed at the close of evidence. *See* Fed. R.Civ.P. 50. Because defendants' motion for judgment as a matter of law contained no arguments with regard to abstention, plaintiffs propose that we need not address this issue at all. Defendants concede failing to include abstention arguments in their Rule 50 motion but, without citing authority, contend that they nevertheless timely reasserted the issue by arguing it in their motion against injunctive relief filed after the entry of judgment. They further suggest that the abstention defense, like lack of subject-matter jurisdiction, cannot be waived.

■ Contrary to defendants' contention, abstention is a waivable defense. *See Bonas v. Town of North Smithfield,* 265 F.3d 69, 76 n. 5 (1st Cir.2001) (holding that appellants had waived their claims regarding abstention); *Kyricopoulos v. Town of Orleans,* 967 F.2d 14, 16 (1st Cir.1992) (recognizing that *"Younger* abstention may be waived"). Our case law is clear that even if a defendant raises a defense in a dispositive motion earlier in the proceedings, "the issue is waived on appeal if not pressed in a Rule 50(a) motion." *Parker v. Gerrish,* 547 F.3d 1, 12 (1st Cir.2008); *Isom v. Town of Warren,* 360 F.3d 7, 9 (1st Cir.2004) (noting that because "defendants did not raise immunity as an issue at the time of their Rule 50 motion ... they have waived that defense as a grounds for the motion"); *see also Bennett v. City of Holyoke,* 362 F.3d 1, 6 (1st Cir.2004) (holding that raising affirmative defense "for the first time in a post-trial motion for relief from judgment" was too late to preserve the issue for appeal).

Nevertheless, whether or not defendants failed to preserve their abstention arguments for appeal, or even had they declined to request abstention entirely, it would not deprive us of authority to consider the issue. *See Bellotti v. Baird,* 428 U.S. 132, 143–44 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (recognizing that "ab-

stention may be raised by the court sua sponte"); *Cruz v. Melecio*, 204 F.3d 14, 22 n. 7 (1st Cir.2000) (ordering abstention sua sponte "[n]otwithstanding that the parties did not raise the [abstention] issues ... either to the district court or on ... appeal"); *see also Olsen v. United States*, 414 F.3d 144, 154 (1st Cir.2005) (recognizing that "[a]n appellate court has discretion to excuse waiver 'in the interests of justice,'") (quoting *Thomas v. Arn*, 474 U.S. 140, 155 & n. 15, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)). Thus, despite the possibility of waiver in this case, in recognition of the important interests underlying the abstention doctrines, *see, e.g., Younger*, 401 U.S. at 44, 91 S.Ct. 746, we will nevertheless address defendants' abstention arguments on the merits.

Considering the merits of defendants' *Younger* and *Burford* abstention arguments, we find no error in the district court's decision to exercise jurisdiction in this case. We explain.

### 1. Younger Abstention

"In *Younger v. Harris* the Supreme Court held that the federal courts must defer to ongoing state *criminal* proceedings." *Bettencourt v. Board of Registration in Medicine*, 904 F.2d 772, 777 (1st Cir.1990) (citation omitted). Since then, the Court has recognized that "[t]he policies underlying *Younger* are fully applicable to *noncriminal* judicial proceedings when important state interests are involved." *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (emphasis added). Thus,

> [s]ince *Younger*, deference has been similarly required to ongoing, originally state-initiated *civil* or even *administrative* proceedings that satisfy three conditions: (1) the proceedings are judicial (as op-

posed to legislative) in nature; (2) they implicate important state interests; and (3) they provide an adequate opportunity to raise federal constitutional challenges.

*Bettencourt*, 904 F.2d at 777 (footnote omitted); *see also New Orleans Pub. Serv., Inc. v. City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 367–68, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (recognizing extension of *Younger* to civil enforcement proceedings); *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (extending *Younger* to administrative proceedings); *Maymó–Meléndez v. Álvarez–Ramírez*, 364 F.3d 27, 31 n. 3 & 34 (1st Cir.2004) (recognizing extension of *Younger* to state administrative proceedings).

The heart of the dispute between the parties arises as to the first prong of the *Younger* analysis. Defendants contend that the entire OIC proceedings against the plaintiffs, including the issuance of its Notice of Investigation in November 2001 and the agency's ex parte subpoenas of plaintiffs' financial records in January 2002 through to the conclusion of plaintiffs' state administrative and judicial challenges of the Order, constitute "state judicial proceedings" that were "ongoing" at the time that plaintiffs filed their federal action. Plaintiffs counter that there was no ongoing state proceeding at the time they brought their federal claim on December 10, 2003 with which the action could interfere. Rather on that date, which they contend is the relevant date for assessing the propriety of abstention, there was only a pending investigation by a state executive agency, a non-judicial body to whom deference under *Younger* is not required. It was not until May 2004 when plaintiffs challenged the OIC's December 23, 2003 Order that proceedings of any kind can be

said to have commenced, and that these, in any event, were not the kind of proceedings to which *Younger* abstention attaches.

■ We first note that, "Younger is not a bar to federal court action when state judicial proceedings have not themselves commenced." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 238–39, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). We are thus called upon to determine whether at the time plaintiffs brought their federal action, which was after the OIC commenced its investigation of the plaintiffs but prior to both the OIC's issuance of an Order against them and plaintiffs' filing of their administrative challenge, the requisite "ongoing state judicial proceedings" were under way in Puerto Rico. We hold that they were not. We are persuaded that the agency's investigation of the plaintiffs was at too preliminary a stage to constitute a "proceeding" triggering *Younger* abstention.

In so holding, we are persuaded by the distinction drawn by the Fourth Circuit in *Telco* between the commencement of "formal enforcement proceedings," at which point *Younger* applies, versus the preceding period involving only a "threat of enforcement," during which abstention is not required. *Telco Commc'ns, Inc. v. Carbaugh,* 885 F.2d 1225 (4th Cir.1989), *cert. denied,* 495 U.S. 904, 110 S.Ct. 1923, 109 L.Ed.2d 286 (1990). In *Telco,* a state agency commenced an investigation of Telco following complaints of wrongdoing by the company. The agency then notified Telco, by letter, of the claimed violations against it and invited it to attend an informal fact-finding conference. *Id.* at 1227.

Following attendance at the conference, Telco sought federal court protection against further action by the agency. *Id.* In rejecting the agency's contention that the letter to Telco constituted the start of administrative proceedings, the Fourth Circuit "decline[d] to hold that *Younger* abstention is required whenever a state bureaucracy has initiated contact with a putative federal plaintiff." *Id.* at 1229. Rather, it reasoned that, "[w]here no formal enforcement action has been undertaken, any disruption of state process will be slight." *Id.* Finally, the court noted that "the [agency's] contention—that abstention is required whenever enforcement is threatened—would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it." *Id.* The court held, therefore, that "the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its [constitutional] challenges in federal court." *Id.*

We believe this rule, requiring the commencement of "formal enforcement proceedings" before abstention is required, better comports with the Supreme Court's decisions in *Younger* and its progeny, in which an indictment or other formal charge had already been filed against the parties seeking relief at the time the federal action was brought. *See, e.g., Younger,* 401 U.S. at 38–39, 91 S.Ct. 746 (federal plaintiff was defendant indicted in state criminal action that was actually being prosecuted when federal complaint was filed);[15] *Huffman v. Pursue, Ltd.,* 420

---

15. This case also differs from the typical *Younger* case in another respect. In *Younger,* the federal plaintiff challenged the constitutionality of the state statute that was the basis for the threatened prosecution and sought to enjoin all enforcement of the statute. *Id.* at

39, 91 S.Ct. 746. Here, however, plaintiffs allege unconstitutional conduct by state officials in the course of enforcing certain regulations, but do not attack the constitutionality of any underlying regulations. "This is important because the Court in *Younger* made the

U.S. 592, 598–99, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (federal plaintiffs were already defendants in nuisance action brought by county officials in state court and adjudicated by state trial court); *Samuels v. Mackell,* 401 U.S. 66, 67, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (federal plaintiffs had already been indicted and were being criminally prosecuted in state court when federal action was filed); *Middlesex,* 457 U.S. at 428–29, 102 S.Ct. 2515 (state disciplinary organization had already formally charged federal plaintiff with a violation of the rule he sought to challenge at the time of the filing of the federal complaint).[16]

In this case, like in *Telco,* at the time that plaintiffs brought their action to federal court on December 10, 2003, the OIC had notified plaintiffs that they were being investigated and had commenced an investigation, which had been pending for almost two years. A report regarding the investigation had been provided by the investigator to the Commissioner, but not to the plaintiffs. No formal charges of any kind had been brought against them. In fact, despite what the report may have contained, the investigator had informed the plaintiffs that his investigation had turned up no irregularities. Thus, it is clear that prior to the issuance of the December 23, 2003 Order, "no formal enforcement action ha[d] been undertaken" against the plaintiffs. *See Telco,* 885 F.2d at 1229. In short, while "the threat of enforcement" against plaintiffs for insurance code violations had been raised at the time plaintiffs filed their federal complaint by virtue of the continuing OIC investigation, nothing resembling formal enforcement proceedings had yet commenced. *Id.* We need not articulate a bright-line rule as to the precise point at which, in the course of an agency investigation, "proceedings" can be said to have commenced. We find it clear that in this case, that point had not been reached at the time plaintiffs brought their federal action.

Defendants counter that even if the OIC investigation did not constitute a "proceeding" for purposes of *Younger,* the relevant inquiry should not focus on the date the federal complaint was filed, but rather, whether, pursuant to *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), "proceedings of substance" had taken place in the federal action at the time the state proceedings commenced. They argue that at the time

---

point that the enjoining of all enforcement of a state statute, though it might be unconstitutional, would strip the state of all enforcement power in that area." *Kaylor v. Fields,* 661 F.2d 1177, 1182 (8th Cir.1981) (citing *Younger,* 401 U.S. at 50–53, 91 S.Ct. 746). This danger of a far-ranging impairment of state law enforcement is not presented here, where plaintiffs seek only to enjoin the conduct of state officials in misapplying valid state regulations against them in an unconstitutional manner. *See id.* Thus, "the interests of comity and federalism are not implicated to the degree that they were in *Younger.*" *Id.*

**16.** Despite this authority, we recognize that the Circuits are in fact split as to whether an indictment or other formal charge is required before an investigation, in the criminal context, ripens into a "proceeding" for purposes of *Younger.* This split features most prominently with respect to the grand jury proceedings stage of a criminal investigation. *Compare Monaghan v. Deakins,* 798 F.2d 632, 637 (3d Cir.1986) *aff'd in part, vacated in part,* 484 U.S. 193, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988) (holding that because "[n]o indictment had been returned against the plaintiffs at the time they filed their complaint in the district court ... there was not, for Younger purposes, any ongoing state proceeding warranting abstention"), *with Texas Ass'n of Business v. Earle,* 388 F.3d 515, 520–21 (5th Cir.2004) (holding that state grand jury proceedings in which subpoenas have been issued constitute an "ongoing state proceeding" such that abstention is warranted). This Circuit has taken no position on the issue, and we limit our holding here to the facts before us.

the OIC's Order was issued, on December 23, 2003, 13 days after the federal action was filed, nothing of substance had yet transpired in the course of the federal proceedings. They further argue that the issuance Order, followed by the OIC administrative proceedings, jointly constituted ongoing proceedings, to which deference, under *Younger*, was due. *See NOPSI*, 491 U.S. at 374, 109 S.Ct. 2506 (Rehnquist, J., concurring) (explaining that administrative proceedings that are " 'judicial in nature' ... should be regarded as 'ongoing' for the purposes of *Younger* abstention until state appellate review is completed").

It is arguable whether there is some tension between *Hicks* and our holding in *Bettencourt*, in terms of the relevant date for assessing whether, for purposes of *Younger*, "ongoing state proceedings" are underway. *Compare Bettencourt*, 904 F.2d at 777 (explaining that "[i]n determining whether federal proceedings would interfere with *ongoing* state proceedings, the proper point of reference is the date plaintiff filed his federal complaint"), *with Hicks*, 422 U.S. at 349, 95 S.Ct. 2281 (*Younger* abstention is required when state court proceedings are initiated after federal action is filed but "before any proceedings of substance on the merits have taken place in the federal court"); *cf. Pennzoil v. Texaco*, 481 U.S. 1, 17, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (analyzing *Younger* abstention as of the time the case was filed in federal court); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (holding *Younger* applicable when "federal litigation was in an embryonic stage and no contested matter had been decided" at the time state criminal summons was issued); *Brooks*, 80 F.3d at 638 (recognizing that the Supreme Court's decision in *Middlesex*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116, "established the basic analytical framework

that still governs *Younger* abstention. Under this paradigm, a federal court must abstain from reaching the merits of a case over which it has jurisdiction so long as there is (1) an ongoing state judicial proceeding, instituted prior to the federal proceeding (*or, at least, instituted prior to any substantial progress in the federal proceeding* ) ....") (emphasis added).

Nevertheless, even if we broaden the timeline to include the Order and subsequent administrative proceedings in Puerto Rico, we nevertheless find no "ongoing state proceedings" of the type to which deference under *Younger* is required. As for the December 23, 2003 Order, its issuance, which was not preceded by any process whatsoever, is properly characterized as "summary action" as opposed to an "administrative proceeding[ ] that [is] judicial in nature." *Maymó–Meléndez*, 364 F.3d at 35–36 (distinguishing the former, to which *Younger* abstention is inapplicable, from the latter, in which it must apply). We agree with the district court that "the administrative proceeding that *Younger* is meant to protect must provide the parties involved with an opportunity to be heard and to present their version of the facts before a final determination is made; a neutral fact-finding process," but that "[n]o such opportunity was given to the plaintiffs" in this case, prior to the issuance of the Order. *Guillemard*, 301 F.Supp.2d at 129.

In contrast, in *Maymó–Meléndez*, we held that where the federal plaintiff was sanctioned by the local racing board "only after full-fledged administrative proceedings" that were "judicial in character," abstention pursuant to *Younger* was required through the full continuum of those proceedings, including judicial review of agency action. *See* 364 F.3d at 35–36. However, we explicitly distinguished that scenario from the scenario of summary

agency action, noting that "[i]f Maymó had been summarily suspended by the Racing Administrator and no administrative proceeding had been begun, he could have gone directly to federal court to challenge his dismissal." *Id.* at 36. The converse is true here. Had the OIC issued its Order sanctioning plaintiffs only after a full-fledged administrative proceeding that was judicial in nature, abstention, as in *Maymó–Meléndez*, would likely have been in order through the duration of the proceedings.

Although defendants point to the subsequent administrative appeal taken by plaintiffs before the OIC (and ultimately, to the Commonwealth courts), these post-hoc remedial proceedings initiated by the plaintiffs are not of the type to which deference under *Younger* applies. Rather, proceedings must be coercive, and in most-cases, state-initiated, in order to warrant abstention. *See Kercadó–Meléndez v. Aponte–Roque*, 829 F.2d 255, 259–61 (1st Cir.1987); *see also Brown ex rel. Brown v. Day*, 555 F.3d 882, 884–85 (10th Cir.2009) (holding that proceeding challenging state agency's decision to terminate Medicaid benefits was remedial and not coercive, and thus was not the type entitled to *Younger* deference); *Majors v. Engelbrecht*, 149 F.3d 709, 712 (7th Cir.1998) (explaining that "[f]or purposes of Younger abstention, administrative proceedings are 'judicial in nature' when they are coercive—i.e., state enforcement proceedings"); *Planned Parenthood League of Mass. v. Bellotti*, 868 F.2d 459, 467 (1st Cir.1989) (explaining that because there was no "state-initiated proceeding, criminal or civil, to enjoin," *Younger* did not apply). As explained by our sister circuit, "a state's enforcement of its laws or regulations in an administrative proceeding constitutes a coercive action, exempt from" the Supreme Court's ruling in *Patsy v. Florida Board of Regents* 457 U.S. 496, 102 S.Ct. 2557, 73

L.Ed.2d 172 (1982), "and entitled to *Younger* deference." *Brown*, 555 F.3d at 890. "Other administrative proceedings fill the 'remedial' category and remain subject to *Patsy*'s holding that a federal § 1983 plaintiff need not exhaust state administrative remedies." *Id.*

We believe our holding, that *Younger* abstention is inapplicable on these facts, is compelled by our decision in *Kercadó–Meléndez*. In that case, the plaintiff, a school superintendent employed by Puerto Rico's Department of Public Instruction ("DPI"), was terminated after an informal DPI hearing in which she responded to allegations of incompetence and improper conduct. *Kercadó–Meléndez*, 829 F.2d at 257. The termination order specified that it would take effect ten days after receipt, unless Kercadó chose to file an administrative appeal to the DPI Board of Appeals. *Id.* at 258. Instead, Kercadó filed a § 1983 suit in federal court alleging that she had been terminated as a result of her political affiliation in violation of her First Amendment rights, and that the state had deprived her of due process by failing to provide her with a pre-termination hearing. *Id.* "The panel majority held that *Younger* did not apply because Puerto Rico did not require any kind of formal procedure prior to the issuing of a termination order and because all post-order proceedings were within the discretion of the aggrieved party and were not necessary to the order's taking effect." *Maymó–Meléndez*, 364 F.3d at 36 (citing *Kercadó–Meléndez*, 829 F.2d at 260–62). We explained that "the administrative proceeding is remedial rather than coercive" because "[t]he administrative appeal process could be triggered only on Kercadó's initiative if she wished to pursue her remedies within the Puerto Rico administrative framework." *Kercadó–Meléndez*, 829 F.2d at 260. Relying on the Supreme Court's

decision in *Patsy*, the panel reasoned, "she was not required to do so" in order to bring a § 1983 action in federal court. *Id.*; *see also Patsy*, 457 U.S. at 514, 102 S.Ct. 2557 (holding that litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court).

In this case, as in *Kercadó–Meléndez,* the December 23, 2003 Order issued by OIC, which sanctioned the plaintiffs for insurance code violations, fined them, and stripped them of their licenses, was to become final within 20 days of its issuance, unless plaintiffs requested an administrative hearing. Although plaintiffs had the option to request a hearing challenging the Order, as in *Kercadó–Meléndez,* this administrative hearing was remedial rather than coercive. This is because "[t]he administrative appeal process could be triggered only on [the plaintiffs'] initiative if [they] wished to pursue [their] remedies within the Puerto Rico administrative framework." *Kercadó–Meléndez,* 829 F.2d at 260. Defendants attempt to distinguish *Kercadó–Meléndez* by emphasizing that Kercadó was only able to file an appeal before an external remedial body, whereas the respondents were able to appeal internally before OIC. We see this as a distinction without a difference, the important point being that the Order sanctioning them was to take effect automatically, and any OIC proceedings would only occur upon the plaintiffs' initiation. And while

here plaintiffs chose to avail themselves of those remedial administrative proceedings, whereas the plaintiff in *Kercadó–Meléndez* chose to forego them, this distinction, again, does not change the essential fact that the proceedings at issue were not of the type to which deference under *Younger* is required. Thus, in this case, by the time "proceedings of substance on the merits" began in federal court, the only pending state proceedings were the remedial proceedings initiated by the plaintiffs. Absent the required type of "ongoing state judicial proceedings," the first prong of the *Younger* analysis was not satisfied.[17] As such, the district court properly denied abstention.[18]

### 2. *Burford* Abstention

■ Defendants additionally assert that the district court should have declined to exercise jurisdiction pursuant to the *Burford* abstention doctrine. *See Burford,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424. Provided that adequate state court review is available, the *Burford* abstention doctrine states that federal courts:

> must decline to interfere with proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import . . ."; or (2) where the "exercise of federal review . . . would be disruptive of

17. Because we decide this case based on the first factor, we need not consider the final two *Younger* factors, involving adequacy of the state forum and extent of the state interest.

18. We note that "even assuming the state proceedings . . . are the sort to which *Younger* applies," abstention may not be appropriate "if the federal plaintiff will 'suffer irreparable injury' absent equitable relief." *NOPSI,* 491 U.S. at 366, 109 S.Ct. 2506 (quoting *Younger,* 401 U.S. at 43–44, 91 S.Ct. 746). Accordingly, plaintiffs further argue that even if the *Younger* abstention doctrine were applicable,

defendants' "bad faith" provides an exception that precludes application of the doctrine. They cite *Phelps v. Hamilton,* 59 F.3d 1058, 1065 (10th Cir.1995), for the proposition that showing that retaliation for the exercise of constitutional rights or discrimination based on protected status constitutes "bad faith" for *Younger* purposes. However, because we find that the requirements for the applicability of *Younger* abstention are not met, we need not reach the question of whether any exceptions to the doctrine apply.

state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*NOPSI,* 491 U.S. at 361, 109 S.Ct. 2506 (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. 1236). As we have explained, *Burford* abstention is concerned with avoiding the "awkward circumstance of turning the federal court into a forum that will effectively decide a host of detailed state regulatory matters, to the point where the presence of the federal court, as a regulatory decision-making center, makes it significantly more difficult for a state to operate its regulatory system." *Bettencourt,* 904 F.2d at 779 (quoting *Bath Memorial Hosp. v. Maine Health Care Fin. Com'n,* 853 F.2d 1007, 1012 (1st Cir. 1988)).

Defendants argue that plaintiffs' federal action is "intrinsically involved with the statutory issue of whether Section 939 [of the Insurance Code] forbids commission sharing" and relatedly, "whether the Commissioner fairly applied [that] provision to the plaintiffs." They further argue that "the resolution of these questions is so related to an overall coherent interpretation and application of [Puerto Rico's Insurance] Code, that *Burford* abstention is appropriate." We disagree.

First, entertaining defendants' federal claims alleging First Amendment and Equal Protection violations did not require the district court to resolve any "difficult questions of state law" regarding the meaning of Puerto Rico's insurance code. This is because plaintiffs' claims are not contingent upon whether or not Puerto Rico's insurance code permits the sharing of commissions. In fact, at no point in the federal litigation was this state law question decided. Rather, the jury was called upon to determine whether the state law, whatever its content, was being enforced

in a manner, or based on motivations, that violated plaintiffs' constitutional rights.

Defendants contend that if it were shown that plaintiffs were properly sanctioned for insurance code violations as a matter of Puerto Rico law, "discriminatory motive is irrelevant." This contention misstates our law. Under the *Mt. Healthy* defense, the government defendant is spared liability despite considering an impermissible criterion, such as political affiliation, in making a decision adverse to a plaintiff, only "by demonstrating that it *would* have made the same decision absent the forbidden consideration." *Texas v. Lesage,* 528 U.S. 18, 20–21, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999) (citing *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)) (emphasis added). In this action, however, the meaning of the state regulatory provision upon which defendants' *Burford* argument relies bears only on the question of whether plaintiffs had, in fact, violated the insurance code. This fact would establish only whether the agency *could* have proceeded against the plaintiffs for a legitimate reason, not that it actually *would* have done so irrespective of prohibited motive, as is required to evade liability under *Mt. Healthy.* Put another way, adverse action that is motivated, in fact, by political or other unconstitutional considerations, is no less offensive to the Constitution, just because legitimate grounds for the same action were also available. *See Estrada–Izquierdo v. Aponte–Roque,* 850 F.2d 10, 16 (1st Cir.1988).

Here, the jury explicitly found the *Mt. Healthy* defense inapplicable, concluding that Contreras had *not* shown by a preponderance of evidence that he *would* have issued the December 23, 2003 Order irrespective of the plaintiffs' political affiliation or their filing of a federal lawsuit. Because the meaning of Section 939 was not

determinative of the question at hand, the Commissioner's motives for the issuance of the Order, "[t]his appeal frames no 'difficult question[] of state law' bearing on significant public policy as would prompt [*Burford*] abstention." *Fragoso,* 991 F.2d at 883 (quoting *NOPSI,* 491 U.S. at 361, 109 S.Ct. 2506).

Second, because the district court was not called upon to decide any issues of Puerto Rico insurance law, it cannot be said that the exercise of federal review in this case would be "disruptive of state efforts to establish a coherent policy" under its regulatory scheme. Moreover, as we explained in *Fragoso, Burford* is normally implicated only "when the federal courts are asked to interfere with state processes by *reviewing* the proceedings or orders of state administrative agencies." *Fragoso,* 991 F.2d at 883 (holding that district court was not required to abstain in malpractice suit against insolvent insurer because federal case would not interfere with Puerto Rico's efforts to create a coherent framework for liquidation of insolvent insurance companies). For example, in *Burford* itself, the Supreme Court abstained when it was called upon to review a state railroad commission's order allocating oil drilling rights. *Id.* In contrast, in this case, the district court was "not being asked to review the actions or decisions of any state body, be it judicial or administrative." *Id.* Exercising jurisdiction did not require the court to weigh in on the merits of the Commissioner's Order or to interfere with the OIC's authority to develop

and enforce whatever insurance regulations it saw fit.[19] It merely enjoined the exercise of that authority, where it was established that OIC officials carried out their functions in enforcing the insurance code in a constitutionally impermissible manner. Doing so was thus not disruptive of Puerto Rico's authority to establish a coherent insurance scheme.

Because exercising federal review in this case neither required resolving difficult questions of state law nor hampered Puerto Rico's ability to establish a coherent insurance scheme, the district court properly denied *Burford* abstention.

### B. Qualified Immunity

■ Defendants assert that both personal capacity defendants, Contreras and Juarbe, are cloaked by qualified immunity as to all constitutional claims made by the Plaintiffs against them. The district court rejected this argument, most recently, in its denial of defendants' Fed.R.Civ.P. 50(b) motion.

"We review the district court's denial of qualified immunity de novo." *Whitfield v. Meléndez–Rivera,* 431 F.3d 1, 6 (1st Cir. 2005). "When, as here, the defendants appeal from a denial of qualified immunity after a jury verdict has been rendered, the evidence is 'construed in the light most hospitable to the party that prevailed at trial,' and deference is 'accorded the jury's discernible resolution of disputed factual issues.'" *Id.* (quoting *Jarrett v. Town of*

---

**19.** We note however, that, though there is no greater disruption, if "the effect of an entire state regulatory scheme [were being] challenged as unconstitutional," *Burford* abstention also would not apply in that circumstance. *Tenoco Oil Co., Inc. v. Department of Consumer Affairs,* 876 F.2d 1013, 1029 n. 23 (1st Cir.1989). After all, "there is ... no doctrine requiring abstention merely because resolution of a federal question may result in

the overturning of a state policy." *Zablocki v. Redhail,* 434 U.S. 374, 379–80 n. 5, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Rather, *Burford* abstention is primarily targeted toward the narrow class of cases seeking individualized review of agency-specific regulatory determinations, where federal intervention would threaten uniformity, and thereby, the state's effort to establish a coherent regulatory policy.

*Yarmouth,* 331 F.3d 140, 147 (1st Cir. 2003)); *see also Jennings v. Jones,* 499 F.3d 2, 10 (1st Cir.2007) (requiring that a post-verdict qualified immunity ruling be consistent with the jury verdict). Deferring, as we must, to the jury's resolution of disputed factual issues, we have no trouble concluding that qualified immunity was properly denied in this case.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Pursuant to the Supreme Court decision in *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), as modified by its recent decision in *Pearson v. Callahan,* the qualified immunity test takes the form of a two-part inquiry. *See* — U.S. ——, 129 S.Ct. 808, 815–16, 172 L.Ed.2d 565 (2009). "First, a court must decide whether the facts a plaintiff has . . . shown . . . make out a violation of a constitutional right," and "[s]econd, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson,* 129

S.Ct. at 815–16 (citing *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151); *see also Bisbal–Ramos v. City of Mayagüez,* 467 F.3d 16, 25 (1st Cir.2006) ("A public officer is not entitled to qualified immunity if he violated a plaintiff's constitutional right and if, at the time of the violation, the right was so clearly established that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (citing *Saucier,* 533 U.S. at 201–02, 121 S.Ct. 2151)).[20] While *Pearson* rendered the sequential nature of the *Saucier* analysis permissive rather than mandatory, it left intact the substantive content of the two-part test. *See Pearson,* 129 S.Ct. at 818; *see also Maldonado,* 568 F.3d at 268–69.

As to the first prong of the qualified immunity test, defendants contend that "the evidence brought at trial is not sufficient for [plaintiffs] to assert a cognizable claim for violation of their constitutional rights." That contention, however, is flatly refuted by the jury's verdict, a verdict the sufficiency of which is not even challenged on appeal. The jury found, by a preponderance of the evidence, that defendants violated the First Amendment and Equal Protection Clause rights of the plaintiffs.[21] Given the deference we must

**20.** "In administering the Court's test, this circuit has tended to list separately the two subparts of the 'clearly established' prong along with the first prong and, as a result, has articulated the qualified immunity test as a three-part test." *Maldonado v. Fontánes,* 568 F.3d 263, 269 (1st Cir.2009); *see, e.g., Morelli v. Webster,* 552 F.3d 12, 18 (1st Cir.2009) (articulating qualified immunity inquiry as requiring court to determine "(i) whether the plaintiff's proffered version of the facts, if true, makes out a violation of a constitutionally protected right; (ii) if so, whether that right was clearly established at the time of the putative violation; and (iii) if the answer to the preceding two queries are affirmative, whether a reasonable public official, situated similarly to the defendant, should have under-

stood the challenged act or omission to violate the discerned right"). In *Maldonado,* we concluded that though our previous articulation of a three-part test was "faithful to the substance of the [Supreme] Court's two-part test," we "owe[d] fidelity to the [Supreme] Court's *articulation* of the test" as well. 568 F.3d at 269 (emphasis added). Thus, we "adopt[ed] the [Supreme] Court's two-part test and abandon[ed] our previous usage of a three step analysis." *Id.*

**21.** That plaintiffs' procedural due process rights were violated by the defendants was established on summary judgment. We have already upheld the district court's denial of qualified immunity on that claim. *See Guille-*

afford at this procedural juncture to the "jury's discernible resolution of disputed factual issues," *Whitfield*, 431 F.3d at 6, and constitutional violations under both the Equal Protection Clause and First Amendment having been found by the jury, we are compelled to conclude that plaintiffs made out a violation of their constitutional rights. *See Borges Colón v. Román–Abreu*, 438 F.3d 1, 19 (1st Cir. 2006) (rejecting, under qualified immunity analysis, a factual scenario proposed by defendants, on the ground that the jury could have found that those facts were not so). As such, the first prong of the qualified immunity inquiry was satisfied with respect to each of the constitutional claims upon which the jury found adversely to the defendants.

Moving on to the second prong of the qualified immunity test, "[w]e consider whether existing case law was clearly established so as to give the defendants 'fair warning that their conduct violated the plaintiff's constitutional rights.' " *Jennings*, 499 F.3d at 16 (quoting *Suboh v. Dist. Attorney's Office of Suffolk*, 298 F.3d 81, 93 (1st Cir.2002)). The law is considered clearly established "either if courts have previously ruled that materially similar conduct was unconstitutional, or if 'a general constitutional rule already identified in the decisional law [applies] with obvious clarity to the specific conduct' at issue." *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

Defendants basically contend that it is not "clearly established" that a licensee can prevail on a First Amendment claim under a pretextual motivation theory in the context of a highly regulated industry. For this proposition they cite only one case, *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 685, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), which, based on our reading, refutes, rather than supports their claim. In *Umbehr*, the plaintiff, who served as a trash collector for the County pursuant to a government contract, had his contract terminated after he spoke out against and published letters critical of the County. *Id.* at 671, 116 S.Ct. 2342. The Tenth Circuit held that "an independent contractor is protected under the First Amendment from retaliatory governmental action, just as an employee would be," *Umbehr v. McClure*, 44 F.3d 876, 883 (10th Cir.1995), and the Supreme Court affirmed. *Umbehr*, 518 U.S. at 685, 116 S.Ct. 2342. The Supreme Court's opinion, which basically extended the *Mt. Healthy* defense to government contractors, held that despite a government employer's general authority to terminate, or not-renew, an at-will government contract, the First Amendment is violated if the employer would not have taken that action but for the contractor's exercise of his protected free speech rights. *See id.* at 685–86, 116 S.Ct. 2342 (remanding case to district court for determination of whether employer "can show, by a preponderance of the evidence ... that, [it] would have terminated the contract regardless of [contractor's] speech"). Defendants further argue, with respect to the First Amendment claims, that given the Commissioners' obligation to implement the insurance code, there were substantial grounds for the Commissioners concluding that they had legitimate justification under the law for acting as they did. We disagree. There is substantial case law, both in the "regulated industry" context and as a general matter, "clearly establishing" that government officials may not sanction a citizen because of his political affiliation or in retaliation for the exercise of his right

*mard*, 490 F.3d at 41. Thus, we need not discuss it further on this appeal.

to petition the courts for redress of grievances. *See Borges Colón,* 438 F.3d at 19 (characterizing as "frivolous" the defendants' argument that "there was no clearly established right in the career plaintiffs not to have their employment terminated due to their political affiliation," and "easily affirm[ing]" the denial of qualified immunity); *El Día, Inc. v. Governor Rosselló,* 165 F.3d 106, 110 (1st Cir.1999) (holding that "[c]learly established law prohibits the government from conditioning the revocation of benefits on a basis that infringes constitutionally protected interests"); *Néstor Colón Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 40–41 (1st Cir.1992) (holding that denial of land use permit in unjustifiable retaliation for applicant's political expression is a First Amendment violation). This is the case even if permissible grounds for the adverse action existed, provided that the adverse action would not have been taken but for the unconstitutional motivation. *See Ackerley Com. of Mass., Inc. v. City of Somerville,* 878 F.2d 513, 521 (1st Cir.1989) (holding that municipality may not use protected speech as a basis on which to decide whether advertisers will be permitted to continue to post billboard advertisements that do not conform with current law); *Packish v. McMurtrie,* 697 F.2d 23, 25 (1st Cir.1983) (holding that selectmen may not retaliate against fireman's political speech by refusing him discretionary indemnification for medical expenses). The constitutional right shown to be violated here was thus "clearly established" such that "it would have been clear to a reasonable officer that his conduct was unlawful." *Bisbal–Ramos,* 467 F.3d at 25.

The jury found breaches of this "clearly established" right when it concluded, with respect to the political discrimination claim, that "the political affiliation or activities of Andrés Guillemard were a substantial or motivating factor in Fermín Contr-eras's December 23, 2003 Order," and that Contreras would not have issued the Order "in the absence of the political affiliation or activities" of Guillemard. It found further breaches with respect to the retaliation claim, when it concluded that plaintiffs' act of filing a federal law suit "was a substantial or motivating factor in Fermín Contreras's decision to issue the December 23, 2003 Order" revoking their insurance licenses, and that Contreras had not shown that he would have done so if plaintiffs had not filed their lawsuit. In denying qualified immunity arguments in defendants' post-trial motions, the district court concluded that "no reasonable official in Contreras's position could have believed that issuing an Order in retaliation for the filing of a lawsuit was constitutionally permissible."

Recognizing that our deference to the jury's view of the facts persists throughout each prong of the qualified immunity inquiry, *see Jennings,* 499 F.3d at 7, we too have no trouble concluding that a reasonable officer, similarly situated to Contreras, would not believe he could subject plaintiffs to punishment under the Insurance Code for politically discriminatory and retaliatory reasons. *See Whitfield,* 431 F.3d at 7. In fact, we have opined accordingly at a previous stage of this case. When faced in 2005 with the qualified immunity issue on defendants' interlocutory appeal of the denial of their motion to dismiss the suit, we stated that taking as "given the facts alleged in the complaint, we have no difficulty concluding that a reasonable official in Contreras's position would have known that instigating an investigation to punish Lone Star plaintiffs for their political beliefs, and terminating their insurance license without notice or a hearing in retaliation for their filing of a legal action would violate their constitutional rights." *Guillemard,* 161

Fed.Appx. at 29. With the factual presumption upon which our earlier qualified immunity conclusion relied having been, in large part,[22] proven at trial, the basis of that decision remains intact. Thus, we again conclude that the district court properly denied defendants qualified immunity with respect to the First Amendment claims.

Finally, with respect to the Equal Protection claim, defendants make a conclusory and unsupported argument that a reasonable officer in Contreras' or Juarbe's position would not understand that sanctioning plaintiffs for insurance code violations would violate their rights to Equal Protection. What the jury found, however, with respect to the Equal Protection violations, was that Contreras treated the plaintiffs differently from others similarly situated, and that such selective treatment was based on, and the same actions would not have been taken but for, the political affiliation and activities of Guillemard. It also found that both Contreras and Juarbe intentionally treated plaintiffs differently than others similarly situated, without a rational basis for the difference in treatment. The district court, citing *Tapalian v. Tusino*, 377 F.3d 1, 6 (1st Cir.2004), found it "obvious that no reasonable official under similar circumstances would have thought it was constitutionally permissible to single out plaintiffs for sanctions, with no rational basis." We agree. We thus affirm the district court's denial of qualified immunity on this, and all other constitutional claims.

## C. Eleventh Amendment Immunity

Defendants next challenge, on Eleventh Amendment grounds, the award of money damages against them for violations of Puerto Rico law.[23] In doing so, they rely upon the Supreme Court's decision in *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In *Pennhurst*, the Supreme Court held that the Eleventh Amendment denies federal courts jurisdiction to award injunctive relief against state officials based upon violations of state law. *Id.* The decision was premised on the notion that the legal fiction underlying the *Ex parte Young* doctrine, a compromise created to balance state sovereignty and federal supremacy interests, *see, e.g., Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), does not apply with equal rigor to state action viola-

---

**22.** While the jury did not find that Contreras instigated the investigation to punish Lone Star plaintiffs for their political beliefs, it did find that his issuance of the December 23, 2003 Order was so motivated.

**23.** By its terms, the Eleventh Amendment provides only that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States *by citizens of another State*, or by citizens or subjects of any foreign state." U.S. Const. amend. XI (emphasis added). The Supreme Court, however, has expanded the doctrine of sovereign immunity beyond the literal words of the Eleventh Amendment, holding that state governments, absent their consent, are not only immune from suit by citizens of another state, but by their own citizens as well. *See Alden v. Maine*, 527 U.S. 706, 728–29, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). This immunity "extends to entities that are determined to be arms of a state." *Pastrana-Torres v. Corporación de Puerto Rico Para La Difusión Pública*, 460 F.3d 124, 126 (1st Cir. 2006). We further note that "[t]he Commonwealth of Puerto Rico is treated as a state for purposes of Eleventh Amendment immunity analysis." *Díaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 33 (1st Cir.2006). Plaintiffs being citizens of the Commonwealth of Puerto Rico, we presume defendants' "Eleventh Amendment" immunity arguments to be premised on this broader conception of sovereign immunity.

tive of state law only.[24] While the *Pennhurst* holding was, on its facts, limited to barring federal *injunctive* relief on state law grounds, defendants argue for extension of that holding to all federal actions containing pendant state law claims against state officials, including actions for damages.

The relevant question, however, is not whether *Pennhurst* is limited in its application to suits seeking equitable remedies, or also, extends to actions at law. Defendants' claim under *Pennhurst* fails regardless. This is because defendants' argument fails to recognize that the Eleventh Amendment, and by implication, "*Pennhurst* [,] do[ ] not bar federal suits challenging state action under both state *and* federal law if the relief sought is not of the kind barred by the Eleventh Amendment—as is true of ... damages to be paid out of the official's pocket." *See* Fallon, Meltzer & Shapiro, Hart & Wechsler's, The *Federal Courts and the Federal System* 1195 (5th ed. 2003) (emphasis added). Where, as here, the relief sought in the federal suit is damages to be paid out of the official's own pocket, be the alleged violations state or federal in origin, the Eleventh Amendment is no bar. This distinction between official capacity and personal capacity suits was recognized by the Supreme Court in *Pennhurst* itself, when, at footnote twenty-one, the Court distinguished several cases in which relief had been awarded against government officials on the ground that those actions sought damages in tort *against the individual*

officers. *See Pennhurst*, 465 U.S. at 111 n. 21, 104 S.Ct. 900. In doing so, the Court explicitly stated that because such monetary relief did not run directly against the government, "nothing in our opinion touches these cases." *Id.*

Despite the absence of support for their contention in *Pennhurst* itself, defendants argue that there is a split among the Circuits on this issue, and proceed to cite our decision in *Díaz–Fonseca*, 451 F.3d at 33–34, for the proposition that this Circuit favors extending *Pennhurst* to actions for damages under state law against state officials sued in their personal capacity. That characterization of *Díaz–Fonseca* is entirely without basis. The portion of *Díaz–Fonseca* cited by defendants involved a claim for damages under state law against the Commonwealth of Puerto Rico itself and its Department of Education, which, we held to be barred by sovereign immunity absent a waiver of immunity by the Commonwealth from suit in federal court. *Id.* The decision said nothing regarding immunity where state officials are sued in their individual/personal capacities.

In short, the distinction between official capacity and individual capacity suits is well established. That distinction depends on " 'the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury.' " *Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 26 (1st Cir. 2007) (quoting *Hafer v. Melo*, 502 U.S. 21,

**24.** *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (holding that the Eleventh Amendment did not bar an action in the federal courts seeking to enjoin a state official from enforcing state statute claimed to violate the Fourteenth Amendment of the United States Constitution). The *Ex parte Young* opinion was premised on the theory that since the state cannot authorize unconstitutional action, the officer is "stripped of his official or representative character and ... subjected in his person to the consequences of his individual conduct." *Pennhurst*, 465 U.S. at 102, 104 S.Ct. 900 (quoting *Ex parte Young*, 209 U.S. at 160, 28 S.Ct. 441). The *Ex parte Young* doctrine has come to stand for an exception to Eleventh Amendment immunity in suits against state officials seeking prospective declaratory or injunctive relief under federal law. *Id.*

26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)).[25] It has been reiterated by the Supreme Court in cases subsequent to *Pennhurst* and has not been departed from by the various circuits, including our own. *See, e.g., Alden,* 527 U.S. at 757, 119 S.Ct. 2240 (explaining that where the plaintiffs' suit seeks money damages from the officer "in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself," sovereign immunity does not bar the suit "so long as the relief is sought not from the [sovereign's] treasury but from the officer personally"); *Hafer,* 502 U.S. at 29–31, 112 S.Ct. 358 (holding that the Eleventh Amendment does not prohibit suits to impose individual and personal liability on state officers under § 1983); *Flores Galarza,* 484 F.3d at 26 ("In short, in a suit against an officer for money damages when the relief would come from the officer's own pocket, there is no Eleventh Amendment bar ..."); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) (holding that defendant official sued in individual capacity "may not assert immunity under the Eleventh Amendment"). As cogently articulated by our sister circuit:

> We recognize that the performance of official duties creates two potential liabilities, individual-capacity liability for the person and official-capacity liability for the [state]. Suits brought against a state official in his official capacity generally represent only another way of pleading an action against an entity of which an officer is an agent.... Person-

al-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. In the former case of liability, the Supreme Court has held that the Eleventh Amendment bars state law claims against state officials for injunctive or monetary relief. However, it is well established in this circuit that a suit against a state officer in his or her individual capacity for money damages is not a suit against the state for purposes of Eleventh Amendment immunity.

*New Orleans Towing Ass'n v. Foster,* 248 F.3d 1143 (5th Cir.2001) (internal citations omitted). This wholesale inapplicability of the Eleventh Amendment to personal-capacity suits applies regardless of whether the claims alleged against the individual officer are grounded in state or federal law. *See Pena v. Gardner,* 976 F.2d 469, 474 (9th Cir.1992) (recognizing that "the eleventh amendment will not bar pendent state claims by [plaintiff] against state officers acting in their individual capacities"); *Wilson v. UT Health Ctr.,* 973 F.2d 1263, 1271 (5th Cir.1992) (recognizing that *"Pennhurst* and the Eleventh Amendment do not deprive federal courts of jurisdiction over state law claims against state officials strictly in their individual capacities"); *see also* Hart & Wechsler, *supra* at 1195 (similar).

▆ Thus, despite defendants' best attempts, nothing in our case law permits us to read *Pennhurst* as calling into doubt the authority of federal courts to award relief on supplemental state law claims against

---

**25.** *See generally* Erwin Chemerinsky, *Federal Jurisdiction* § 7.5.2, at 430 (4th ed. 2003) ("[T]he fact that a government officer is acting in the scope of official duties is not enough to bar a suit as being in 'official capacity.' "); *cf. Muirhead v. Mecham,* 427 F.3d 14, 18 (1st Cir.2005) ("[A] suit, although nominally aimed at an official, will be consid-

ered one against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." (internal quotation marks omitted)).

state officials where the monetary relief is not sought from the state's treasury. The federal judiciary is authorized to hear supplemental claims for damages under state law pursuant to 28 U.S.C. § 1367, and in the context of personal capacity suits, the Eleventh Amendment places no limitations on that jurisdictional grant. As damages in this case are being sought from and awarded against Contreras and Juarbe in their personal capacities only, the Eleventh Amendment provides them no defense.

### D. Overlap of Claims

■ Defendants also argue that the district court committed reversible error in submitting plaintiffs' Equal Protection Clause claims separately to the jury, when those claims substantially "overlapped" with plaintiff's claims under the First Amendment. Specifically, defendants characterize plaintiffs' main claim, under the First Amendment, as being that because of their political affiliation, plaintiffs were investigated and then fined for sharing commissions, an activity for which no other insurance agent or broker had been investigated or fined. This claim, defendants contend, substantially overlaps with plaintiffs' Equal Protection Clause claim. Defendants argue that submitting both claims to the jury was prejudicial as it likely resulted in duplicative recovery.

Defendants, however, offer no explanation as to why it was impermissible to submit both theories to the jury. While their brief cites, without analysis, two of our cases, *Rosenfeld v. Egy*, 346 F.3d 11, 15 (1st Cir.2003) and *Custodio*, 964 F.2d at 45, we fail to see how either of these cases support their position.

*Custodio* involved the dismissal, on summary judgment, of plaintiffs' Equal Protection claim premised on a local planning board's discretionary decision to deny them a land use permit, which we affirmed, finding that an equal protection clause claim was not stated. *See* 964 F.2d at 44. In affirming summary judgment, we also cited the policy dangers of allowing challenges to discretionary local permitting decisions to proceed on an Equal Protection theory and noted the overlap, in any event, between that plaintiff's Equal Protection and First Amendment theories. *Id.* at 44–45. *Rosenfeld* similarly involved a grant of summary judgment in favor of defendant, a police officer, on plaintiff's Equal Protection claim premised on the officer's discretionary decision to deny plaintiff's firearm permit renewal application. *See* 346 F.3d at 15. We affirmed the dismissal, reasoning that "Rosenfeld ha[d] not presented sufficient evidence to show that he was treated differently than similarly situated individuals." *Id.* We then, citing the policy problems described in *Custodio* of permitting disgruntled applicants subjected to a discretionary permit denials to proceed under an Equal Protection theory, explained that in any event, the plaintiff's Equal Protection claim "substantially overlap[ped] with his stronger First Amendment claim," which we also held to be not substantially supported. *Id.* at 15, 18.

First, the language in *Custodio* and *Rosenfeld* regarding overlap is expressly limited to the discretionary benefit denial claim context, which is not presented here. Second, even if overlap were present, we see nothing in these cases that precludes a court from submitting to a jury First Amendment and Equal Protection claims that are both substantially supported. *See, e.g., Torres–Torres v. Puerto Rico*, 353 F.3d 79, 82 (1st Cir.2003) (noting that although ballot-access cases typically involve both First Amendment and Equal Protection claims and "the two claims often overlap, it is sometimes appropriate to analyze

them separately under different standards of review"). It is, of course, true that "a plaintiff is entitled to only one full recovery, no matter how many different legal grounds may support the verdict." *Freeman v. Pack. Mach. Co.*, 865 F.2d 1331, 1345 (1st Cir.1988); *see also Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 383 (1st Cir.1991) ("[R]ecovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory."). But "in this circuit, the primary mechanisms to avoid impermissible duplicate awards for damages [on possibly overlapping claims] are the jury instructions and the structure of the verdict form." *Valentín–Almeyda v. Municipality Of Aguadilla*, 447 F.3d 85, 102 (1st Cir.2006).

Furthermore, assuming that plaintiffs' First Amendment and Equal Protection claims did overlap, defendants have not shown that they suffered prejudice, i.e., any duplicative damages, as a result of the submission of both to the jury. While defendants allege, without elaboration, that the damage amounts awarded by the jury were "most probably [ ] duplicated under a wrong impression that an amount in compensatory and punitive damages was warranted for each of the two overlapping claims," we find no basis for concluding that excessive recovery was in fact awarded. First, the verdict form called for one single damages award against Contreras on all four separate claims under the First Amendment and Equal Protection theories, which is the precise format that we described as "proper practice" for avoiding impermissible duplicate awards. *See Acevedo–García v. Vera–Monroig*, 351 F.3d 547, 569 (1st Cir.2003) ("To the extent that a jury award on both claims would be duplicative, the proper practice is to ensure that the verdict form is structured so as to allow the jury to recompense the plaintiff['s] injuries just once."); *see also Britton v. Maloney*, 196 F.3d 24, 32 (1st Cir.1999) (explaining that "when multiple claims exist but separate damages on each would be partly or wholly duplicative" and parties agree that damages should be the same on each claim, the verdict form should "identify separate bases for liability but have only a single line for damages"). Second, the court gave "[jury] instructions clearly directing the jury to compensate the plaintiff's injuries just once." *Valentín–Almeyda*, 447 F.3d at 102. Specifically, the court instructed the jurors that they "must arrive at a sum of money that will justly, fairly and adequately compensate the plaintiffs for the actual pain, suffering and emotional distress [it] find[s] that they endured as a direct result of any constitutional deprivation, defamation, invasion of privacy or negligence." It further explained that "[t]he damages that [it] award[s] must be fair compensation for all the plaintiffs' damages, no more or no less." Thus, even if the jury found that the same unlawful conduct and injury supported two theories of liability, there is no basis for assuming that the jury believed it was required to award plaintiffs a separate amount of damages for each claim. With no basis for concluding that duplicative recovery was awarded, there is no prejudice, and, as a result, no ground for disturbing the judgment.[26]

---

**26.** Defendants, separately, without elaboration, contend that the district court erred in basing its liability finding on the Equal Protection claims on two distinct theories: "selective enforcement" and "discrimination in treatment against a class of one." This argu-ment fails for lack of developed argumentation. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## E. Evidentiary Challenges

Finally, defendants argue that the district court erred in its rulings on various evidentiary matters. First, they contend that Guillemard and Urrutia were erroneously allowed to provide hearsay testimony regarding conversations they had with deceased former Insurance Commissioner Juan Antonio García, in which García had purportedly told them to create a fee sharing agreement between UVI and Lone Star. They relatedly contend that the court erred in excluding evidence rebutting this testimony, in the form of a transcript from a committee hearing during which García allegedly disclaims knowing of a relationship between Lone Star and UVI. Second, defendants contend that the court erroneously excluded from the evidence an Order issued against UVI on the day the Order against Lone Star was issued, which, they contend, would have bolstered their argument against plaintiffs' arbitrary and selective enforcement claims. Third, they contend that the district court erroneously excluded documents and testimony relating to an OIC investigation of another insurance company, "Ocaso," which, defendants allege, would have undercut the plaintiffs' claim that they were the only ones ever penalized under the commission sharing regulation.[27] Defendants raised these arguments during trial, and later, in their Rule 50 and 59(a) motions before the district court. In its Opinion & Order denying these post-trial motions, the district court concluded that its earlier evidentiary rulings were "not erroneous."

We normally "review the trial court's rulings admitting or excluding evidence only for abuse of discretion." *United States v. Pakala,* 568 F.3d 47, 52 (1st Cir.2009) (internal quotation marks omit-

ted). "Moreover, we 'disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.'" *Pelletier v. Main Street Textiles, LP,* 470 F.3d 48, 52 (1st Cir.2006) (quoting Fed.R.Civ.P. 61). "Thus, even if an evidentiary ruling is erroneous, we will not disturb the jury's verdict 'if it is highly probable that the error did not affect the outcome of the case.'" *Id.* at 52–53 (quoting *McDonough v. City of Quincy,* 452 F.3d 8, 19–20 (1st Cir.2006)).

Reasserting their evidentiary challenges once more before this court, defendants fail to include in their appellate brief citations to the relevant portions of the appendix or transcript as explicitly required by our procedural rules. Specifically, pursuant to Rule 28(e) of the Federal Rules of Appellate Procedure ("FRAP"), "[a] party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected." Fed. R.App. P. 28(e); *see also* 1st Cir. Loc. R. 28(e) (same). Defendants fail to comply with this procedural requirement, not including in their brief a single reference to their voluminous (3000 + page) appendix or to the transcript of the proceedings below, where rulings as to the challenged evidence were made. They include only two references: to two docket numbers corresponding with the district court's written rulings on evidentiary motions. We therefore hold their evidentiary objections to be waived. *See Conto v. Concord Hosp., Inc.,* 265 F.3d 79, 81–82 (1st Cir.2001) (holding claim waived on appeal on the basis of counsel's failure to comply with procedural rule requiring citations to the record); *United States v. Isabel,* 945 F.2d 1193, 1199 n. 12 (1st Cir.

---

**27.** The district court had excluded the evidence on grounds that it was not relevant and

not timely produced.

1991) (holding that because defendants "failed to comply with the FRAP 28(e) requirement that reference be made to the transcript pages containing the evidence whose admissibility is controverted on appeal" they "must be deemed to have waived their 801(d)(2)(E) claim" challenging the admissibility of co-conspirator statements).

In basing our holding on this issue on defendants' non-compliance with our procedural rules, we urge the parties to "recognize that rules are not mere annoyances," but, rather, they "lie near the epicenter of the judicial process." *Reyes–Garcia v. Rodriguez & Del Valle, Inc.*, 82 F.3d 11, 15 (1st Cir.1996). This principle is evident here where defendants' substantial noncompliance with Rule 28(e) severely hamstrings our ability to review the evidentiary issues they raise. *See id.*; *see, e.g., Isabel*, 945 F.2d at 1199 (explaining that "[w]e cannot conduct effective appellate review of an evidentiary ruling admitting coconspirator statements under Evidence Rule 801(d)(2)(E) absent reference to the challenged statements."). For example, defendants challenge the exclusion of the OIC Order issued against UVI, which they claim, "seriously prejudiced [them]." However, they provide no citations to anything in the record or transcript that would alert us to the contents of the Order, leaving us without a basis to evaluate the propriety of its exclusion. We face a similar problem with respect to defendants' challenge to the exclusion of the "Ocaso" documents, which the district court excluded, in part, on relevancy grounds. Defendants contend that, pursuant to Rule 403 of the Federal Rules of Evidence ("FRE"), the probative value of those documents outweighed any concern of prejudice. But as we have held, "[b]ecause the judicial officer who presides at a trial has a unique perspective which enables [him] to make assessments of this kind knowledgeably, 'only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" *United States v. Pitrone*, 115 F.3d 1, 8 (1st Cir.1997) (quoting *Freeman*, 865 F.2d at 1340). We fail to see how defendants intended to meet this heavy burden without even referring us to the relevant portions of that "cold appellate record" containing the contents of the challenged evidence. In short, they have not.

### III. *Conclusion*

For the foregoing reasons, the judgment of the district court is affirmed in all respects.

*Affirmed.*